2008 VT 125

# Dawn Griffis v. Cedar Hill Health Care Corporation

[967 A.2d 1141]

No. 07-282

Present: Dooley, Johnson, Skoglund and Burgess, JJ., and Pearson, Supr. J., Specially Assigned

Opinion Filed September 19, 2008

*Brian A. Sawyer* of *Welford & Sawyer, P.C.*, Manchester Center, for Plaintiff-Appellant.

*W. E. Whittington* of *Whittington Law Associates, PLLC*, Hanover, New Hampshire, for Defendant-Appellee.

¶ 1. **Burgess, J.** Plaintiff Dawn Griffis, a certified nurse practitioner, appeals from the superior court's judgment in favor of her former employer, defendant Cedar Hill Health Care Corporation (Cedar Hill). In that order, the superior court concluded that plaintiff had failed to meet her burden of proving that her termination was (1) causally related to activities protected by Vermont's Whistleblower Act, and (2) that the other reasons given for her termination were pretextual. We affirm.

¶ 2. After a bench trial, the superior court made the following findings of fact. Cedar Hill is a Vermont corporation that operates two healthcare facilities in Windsor, Vermont: Victorian House, a Level III residential care facility; and the Health Care Center, a thirty-nine-bed nursing home. The Village at Cedar Hill, a separate but related legal entity, operates a Level I "independent and assisted living" facility in Windsor. The Village is made up of apartments in which residents, to the extent they are able, do their own cooking and housework, and come and go at will.

¶ 3. Cedar Hill hired Griffis on June 14, 2004 as Director of Nursing Services at the Health Care Center. From June 14

through July 9, Griffis' responsibilities were assigned solely to the Health Care Center. Starting July 9, she was given additional responsibilities as an "RN consultant" to both the Village and Victorian House, and a concomitant pay raise of $5000 per year. In addition to her original duties at the Health Care Center, Griffis began providing nursing "overview" to those facilities. She had no responsibility at any time for managing either the Village or Victorian House, and was never responsible for hiring or supervising staff at either facility.

¶ 4. At a board meeting in July 2004, Griffis proposed converting the ground level of the Village into a dementia unit, and her supervisors requested that she submit for their review a written proposal detailing her plans. Griffis wrote a proposal recommending changes to staffing levels at Victorian House and the Village, moving some of the residents, and hiring additional staff. While her supervisors were considering the proposal, Griffis proceeded with some of the staffing changes she felt were needed for the conversion. The supervisors became aware that this was happening when they were approached by the Village manager, who asked them to clarify why Griffis was making staffing changes without authority to do so. By the time the manager approached Griffis' supervisors, Griffis had offered a job at the Village to a Victorian House employee and had unilaterally pulled all but two staff from the Village, leaving it inadequately staffed to meet resident-care needs. Griffis' supervisors approached her about these actions, expressed their concerns, and explained the staffing hierarchy to Griffis. Griffis disagreed with her supervisors about the hierarchy and contended that, as director of nursing services, she should have the authority to hire, fire, and discipline staff.

¶ 5. At approximately this time, Griffis' supervisors began to be concerned that she was spending more time than necessary at the Village and the Victorian House, both of which had management in place, and too little time in the Health Care Center, to which she was primarily assigned. The supervisors were informed by the assistant director of nursing that Griffis was not keeping up with her responsibilities at the Health Care Center. The supervisors circulated a memorandum to Griffis and two other employees clarifying their respective responsibilities for staffing supervision, hiring, and scheduling. The memorandum stated that Griffis "is not the person responsible for the hiring of the aides or for the supervision or for the scheduling in Victorian House. The afore-

mentioned aide staffing supervision[,] hiring[,] and scheduling is the responsibility of the Community Administrator. In the Village this is the responsibility of the Village Director." Griffis again disagreed with her supervisor about this allocation of authority, and admitted that the two "clashed" over it. Griffis' supervisor stated that, around this time, she began to see Griffis as stubborn and uncooperative.

¶ 6. Soon after, Cedar Hill filled an opening in the position of social services director with a person who was not a licensed social worker and who, according to Griffis, did not have direct experience in the nursing home setting. Although Griffis was not involved with the hiring of the new employee, and would have no supervisory responsibilities over her, Griffis was concerned with the new employee's qualifications. Griffis approached the new employee three times and told her she was not qualified under the applicable state regulations. According to the new employee, Griffis then gave her only the portion of the regulations applying to larger nursing homes, at which the social-services-director position must be filled by a licensed social worker, and not the portion of the regulations governing smaller homes, at which social services directors need not be licensed. Cedar Hill is subject to the regulations for smaller homes.

¶ 7. At the end of a staff meeting soon after the hiring, Griffis and two other employees expressed their concerns about the social services director to their supervisors. Griffis contended that the social-services-director position needed to be filled by a licensed social worker under the applicable regulation, while her supervisors believed that the regulation applied only to larger nursing homes. Griffis characterized the supervisors' response to her concerns as "angry," but the other two complaining employees stated that their concerns were acknowledged and answered respectfully. Neither of the other two employees suffered any adverse employment consequences as a result of raising their concerns about the social services director. Griffis states that she was "far more dogged" than her coworkers in making her concerns known. At the time of the decision below, the social services director was still employed at Cedar Hill, and state regulators who had evaluated the facility had found no fault with her lack of a social work license.

¶ 8. As noted, during this time Griffis' supervisors were concerned that Griffis was no longer fulfilling her original job

responsibilities in the Health Care Center because she was spending too much time in the Village and the Victorian House. Thus, on August 18, 2004, they relieved her of the additional duties she had been assigned at the latter two facilities.[1] This was done by memorandum, which stated in part as follows:

> Effective this date, I am requiring that you place your full attention on the duties and responsibilities as the DNS of Cedar Hill's nursing unit only. I feel that you have been spread [too] thin covering both the Victorian House and the Village. . . .
>
> . . . In addition, I am asking for detailed daily reports on resident conditions and staff issues. I need to be made aware of issues and how they are being handled — I don't want to micro-manage, just be kept informed. I would like . . . to be kept abreast of potential employees and where you plan to put them if approved for hire.

Griffis responded, also by memorandum, on August 20, 2004, and was, in her words, "forceful" in her disagreement with the decision to reduce her responsibilities. Griffis' responsive memorandum does not assert any belief that her responsibilities were reduced in retaliation for her concerns about the social services director.

¶ 9. Griffis continued to clash with her supervisor over the latter's desire to be involved with "plan care meetings" and felt that her supervisor was micromanaging; Griffis wrote to her supervisor to express her opinion that, when people say they are not going to micromanage, they actually plan to do just that. When Griffis' supervisor asked to attend a plan care meeting, Griffis asked, "Aren't there better things for you to do?"

¶ 10. On September 9, 2004, according to Griffis, her supervisors considered hiring an unqualified eighteen-year-old as an aide in Victorian House. Griffis claims that she expressed her concern that this would undermine good patient care, and concedes that the person never was hired. Neither of Griffis' supervisors had any memory of the incident, and no such person was ever actually hired. Similarly, Griffis contended at trial that on September 9,

---

[1] Although the supervisors stated at the time that Griffis' compensation would be reduced to reflect her diminished responsibilities, the record reveals that her compensation did not change.

2004, two unqualified people dispensed medication to patients at Victorian House. Griffis' supervisor denied the allegation, and Griffis avers only that she told her supervisor about the alleged infraction; Griffis did not disclose the problem to anyone else.

¶ 11. Griffis' employment was terminated on September 10, 2004. She then brought this suit, alleging that she was fired in retaliation for reporting to her supervisors her concerns about the social services director, the never-hired eighteen-year old, and the alleged dispensation of medicines by unqualified people.[2] Griffis' suit was premised on her claim that the termination of her employment violated 21 V.S.A. § 507, which provides protection for "whistleblowers" who are employees of hospitals and other health-care facilities. The trial court, after making the above findings, concluded that plaintiff had not met her burden of showing "either (1) that the reasons given for her termination were pretextual, or (2) that the real reason for her termination was that the managers of Cedar Hill wanted to retaliate against her for disclosing perceived problems." Griffis appealed. The trial court's conclusions of law are set out below, in connection with Griffis' specific claims of error.

## I. The *McDonnell Douglas* Standard

¶ 12. Plaintiff's first claim of error is that the trial court failed to consider certain evidence pertinent to the third step in the so-called *McDonnell Douglas* burden-shifting framework, which we have applied in analyzing Vermont Fair Employment Practices Act (FEPA) claims. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 15, 178 Vt. 244, 882 A.2d 1177. Under the *McDonnell Douglas* framework, a plaintiff must first establish, by a preponderance of the evidence, a prima facie case of retaliation. *Gallipo*, 2005 VT 83, ¶ 15. The elements of a prima facie case are: (1) the plaintiff engaged in a protected activity; (2) the employer was aware of the activity; (3) the plaintiff suffered adverse employment consequences as a result of the activity; and (4) there was a causal connection between the activity and the conse-

---

[2] The court concluded that plaintiff could not base her retaliation claim on her mere allegation that her supervisors considered hiring an unqualified eighteen-year-old, or on the alleged dispensation of medicines by unauthorized people, because plaintiff had not shown that she complained about either issue before her employment was terminated.

quences. *Id.* If the plaintiff makes out a prima facie case, the burden of production shifts to the defendant, who must state legitimate, nonretaliatory reasons for the adverse employment action. *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 26, 176 Vt. 356, 848 A.2d 310. If the employer meets this burden, the burden is again on the plaintiff to prove by a preponderance of the evidence that the articulated reasons are pretextual. *Id.* ¶ 27; *Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 15, 175 Vt. 413, 834 A.2d 37. This third step is similar to, and may require analysis of the same evidence as, the first step.

¶ 13. Here, the trial court concluded that Griffis had "not met her burden of proving either (1) that the reasons given for her termination were pretextual, or (2) that the real reason for her termination was that the managers of Cedar Hill wanted to retaliate against her for disclosing perceived problems."[3] The court noted that Griffis was fired after complaining while two other employees who raised similar concerns about the social services director's qualifications were not. The court explained that "[c]onsideration of the entire record supports the conclusion that Cedar Hill fired Griffis for insubordination, and not for reporting her concerns about possible violations of the law, or her concerns about improper . . . patient care." Further, the court went on, "strong evidence supports the conclusion that Cedar Hill fired [Griffis] for legitimate, nonretaliatory reasons."

■ ¶ 14. While the court might have been more explicit in supporting its conclusion with more specific findings, we have no difficulty affirming based on the entire record. See *Gilwee v. Town of Barre*, 138 Vt. 109, 111, 412 A.2d 300, 301 (1980) (this Court may affirm the trial court on any proper basis revealed by the record). There was ample support in the record for the conclusion that Griffis' termination was caused by her insubordination, and not by her engaging in protected activities. See *Gallipo*, 2005 VT 83, ¶ 15. As noted above, the court found that Griffis: (1) had multiple confrontations with her supervisors over the management hierarchy at Cedar Hill, (2) acted without regard to that hierarchy in several instances, (3) confronted a coworker about her supposed underqualification despite having no supervisory authority over the coworker, (4) failed to keep up with her original responsibilities in

---

[3] Griffis concedes that Cedar Hill met its burden of production by articulating legitimate, nonretaliatory reasons for her termination.

the Health Care Center, and (5) refused to invite or notify her supervisor to attend certain meetings in which the supervisor had expressed an interest.

■ ¶ 15. Griffis' arguments regarding causation are directed at the trial court's assessment of credibility and weight. As credibility and weight are the province of the trial court, these arguments are no impediment to affirming the trial court's decision. See *In re Route 103 Quarry*, 2008 VT 88, ¶ 12, 184 Vt. 283, 958 A.2d 694 ("[I]t was the trial court's prerogative to assess the credibility of witnesses and weigh the evidence."). The question before us on appeal is not whether there was a basis upon which the court might have reached a different conclusion, but whether there was a basis in the record upon which the court could reach the conclusion it did. *Gilwee*, 138 Vt. at 111, 412 A.2d at 301.

## II. Rule 52

■ ¶ 16. Griffis next contends that the trial court "failed to make legally sufficient findings of fact and conclusions of law." See V.R.C.P. 52; *Jensen v. Jensen*, 139 Vt. 551, 433 A.2d 258 (1981). The first aspect of this contention is that the court "failed to adequately consider the evidence presented at trial, and thus, as a matter of law, failed to conduct the inquiry envisioned under the *McDonnell Douglas* framework and Vermont case law."[4] This argument appears to be little more than a recasting of the argument rejected above. See *supra*, ¶ 15. It is the province of the trial court to weigh the evidence. Griffis' bare assertion that the court "failed to adequately consider the evidence" can be read only as a general challenge to the trial court's exercise of its prerogative to decide which evidence and witnesses to credit.

■ ¶ 17. Griffis also argues, in the alternative, that the "conclusory nature of the trial court ruling on liability and the lack of discussion concerning key evidence and how that evidence was weighed, support a conclusion on appeal that the court's findings of fact and conclusions of law are inadequate." Because of this purported deficiency, Griffis argues, "this Court is left to speculate as to the reasons for the [trial] court's decision." As

---

[4] It appears that Griffis may also intend, by citation of Rule 52(a), to assert that the trial court's findings were clearly erroneous. As Griffis does not state *which* findings, specifically, she claims are clearly erroneous, we do not reach the claim. See V.R.A.P. 28(a)(4).

noted above, the trial court could have more clearly linked its conclusions to its extensive findings, but the lack of more express linkage does not, by itself, require reversal. See *Quazzo v. Quazzo*, 136 Vt. 107, 113, 386 A.2d 638, 642 (1978) ("[W]e examine the record to see whether a given result is supportable, upon the assumption that the trial court had the evidence in mind."). This is not a case like *Jensen* where the court's ultimate decision was based on no explicit findings at all and we were left to speculate as to the basis for the trial court's decision. See *Jensen*, 139 Vt. at 553, 433 A.2d at 260. Here, the trial court made clear enough that Griffis' insubordination and usurpation of unassigned responsibility served as legitimate grounds for termination, and that her complaints about hiring an underqualified caregiver were insufficient to carry her burden of persuasion on pretext, given that her coworkers made the same complaint without being terminated.

## III. Exclusion of Evidence

¶ 18. Griffis' final claim of error is that the trial court improperly excluded "at least six evidentiary matters, all of which were relevant to considerations before the court." As plaintiff notes, the trial court ruled that the proffered evidence was irrelevant, while Griffis contended at trial that the information was relevant because "the case, by its nature, required an understanding of context and circumstances." Plaintiff's argument on appeal is that "[b]y excluding the evidence, the trial court prevented Griffis from presenting a full picture of the context and circumstances surrounding her demotion and firing." We agree with the trial court that the proferred evidence was not relevant, and was therefore properly excluded. Rulings on the admission or exclusion of evidence are highly discretionary, and we will reverse only where discretion has been abused or withheld and prejudice has resulted. The burden on a party claiming an abuse of discretion in determining the relevance of evidence is a heavy one. *Doucette v. Doucette*, 168 Vt. 626, 628-29, 725 A.2d 901, 903 (1998) (mem.). Griffis has not met that burden.

¶ 19. The testimony Griffis claims was improperly excluded appears to have been largely about events that occurred outside of Griffis' tenure at Cedar Hill.[5] Griffis asserts that these matters

---

[5] Griffis asserts that section V of her brief explains the six asserted evidentiary errors. That section, however, does not name the six errors; we assume that Griffis

were "relevant to considerations before the court" to "present[] a full picture of the context and circumstances surrounding her demotion and firing." Griffis has not stated with any particularity how the excluded evidence was relevant to any of her three causes of action, and we discern no error in the trial court's conclusion that the excluded evidence was irrelevant. Further, even if the excluded evidence were relevant, its exclusion would not be grounds for reversal unless Griffis had demonstrated that its exclusion likely affected the outcome of the case. See V.R.E. 103(a); *Jakab v. Jakab*, 163 Vt. 575, 579-80, 664 A.2d 261, 263 (1995). Griffis has made no such showing.

*Affirmed.*

---

meant to refer to section IV of her brief, in which there appears a list of excluded evidence.