NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2017 VT 24

No. 2015-292

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Criminal Division |
| | |
| Christopher Sullivan | June Term, 2016 |

Theresa S. DiMauro, J.

William H. Sorrell, Attorney General, and David Tartter, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

Matthew Valerio, Defender General, and Joshua O'Hara, Appellate Defender, Montpelier, for Defendant-Appellant.

PRESENT: Reiber, C.J., Dooley, Skoglund,[1] Robinson and Eaton, JJ., and Morris, Supr. J., (Ret.), Specially Assigned[2]

¶ 1.  **EATON, J.**  Defendant was convicted of operating a motor vehicle while under the influence of intoxicating liquor (DUI) with death resulting, in violation of 23 V.S.A. §§ 1201(a)(2) and 1210(f)(1), and leaving the scene of a fatal accident, in violation of 23 V.S.A. § 1128(a) and (c). On appeal, he challenges the trial court's jury instructions, admission of expert testimony, and denial of his motion for access to necessary services as a needy person pursuant to 13 V.S.A. § 5231(a)(2). We affirm defendant's convictions but remand the matter for resentencing

---

[1] Justice Skoglund was present for oral argument, but did not participate in this decision.

[2] Judge Morris was not present for oral argument, but reviewed the briefs, listened to oral argument, and participated in the decision.

based on our conclusion that the trial court abused its discretion by not continuing the sentencing hearing to allow defendant to present the testimony of his expert witness.

## I. Facts and Procedural History

¶ 2. The evidence when viewed in the light most favorable to the State established the following facts. On April 10, 2013, defendant consumed six or seven alcoholic beverages between the hours of five and seven forty-five in the evening. At seven forty-five, defendant drove south on Strongs Avenue in Rutland at a speed of between twenty-two and thirty miles per hour. It was dusk, and a light rain was falling. Also at this time, the victim, a seventy-one-year-old woman wearing a cream-colored coat and walking with the assistance of two canes, began crossing Strongs Avenue with a friend from east to west in front of the Palms Restaurant, having looked in both directions before starting across the street. The victim walked at an estimated pace of between one-and-one-half-to-three feet per second. She was not in a crosswalk and defendant's car came upon her before she was able to cross the road. Just before the car struck her, the victim's friend called out in warning and the victim turned and raised both of her canes. Without braking or swerving, defendant's car struck the victim in the travelled portion of Strongs Avenue. The victim was thrown onto the hood of defendant's vehicle and into the windshield before landing in the street. Defendant continued driving without slowing down. He later told police that he had no idea who or what he hit, that he panicked and was unsure what to do, and that he continued driving to the Hannaford's parking lot. When defendant got out of his vehicle he saw damage to the hood and a shattered windshield. His rear-view mirror was detached, and there were shards of glass on the passenger seat.

¶ 3. From the parking lot, defendant called his law partner, who informed him that an ambulance had arrived at the scene in front of the Palms Restaurant. In a subsequent phone call, defendant's partner informed him that the victim had been pronounced dead at the hospital as a result of blunt-force trauma to her torso. Defendant spoke to his law partner again later that night,

2

as well as to defense counsel. He made no effort to contact the police that night. Defendant had planned to pick up his son, but instead called his son from the Hannaford's parking lot and told him, untruthfully, that he had been delayed by a work obligation.

¶ 4. The next day defendant went to the police station with his attorney to give a statement. He told police of his activities the preceding night, including the amount and time of his alcohol consumption. He also told police that he had been driving thirty miles per hour and did not see the victim in the street before the accident.

¶ 5. At trial, the State offered expert testimony from Trooper John Young of the Vermont State Police and Dr. David Nierenberg, a board-certified pharmacologist and toxicologist who focuses on drugs and medications. Trooper Young, who was the primary accident reconstructionist assigned to investigate the accident, offered testimony about his accident report. In that report, he made two calculations: one assuming a vehicular speed of twenty-two miles per hour, which he determined from surveillance video, and the other assuming a vehicular speed of thirty miles per hour, which was based on defendant's statement to police. Assuming that the victim was walking across Strongs Avenue at one-and-one-half-to-three feet-per-second, and assuming a reaction time of two-and-one-half seconds for nighttime or dimly lit driving conditions, Trooper Young concluded that if defendant had been alert and paying attention and had reacted appropriately, he would have been able to stop between 60 and 212 feet before the actual point of impact.

¶ 6. Dr. Nierenberg testified as to the effects of alcohol on the human body and brain. He testified that a moderate-to-heavy-drinking male of defendant's approximate weight, following the drinking pattern defendant provided to police, would have had a blood-alcohol content (BAC) of between 0.044 and 0.061 percent at the approximate time of the collision. He explained that this estimate was based on a male with the fastest metabolism, meaning that there was a ninety-nine-percent possibility that defendant's actual BAC would have been higher than Dr.

3

Nierenberg's estimates. Dr. Nierenberg further testified that studies have shown that at a BAC of 0.04 percent, virtually every subject shows some degree of impairment, and that at a BAC of 0.06 percent, nearly every subject shows impairment in a clearly measurable amount.

¶ 7. Dr. Nierenberg opined that a person of defendant's weight and drinking pattern was likely under the influence of intoxicating liquor as defined by Vermont law—someone who had "lost full control of the faculties of mind and body, due to the effect of intoxicating liquor." He stated further that the failure to see a pedestrian, brake, steer away, or slow down after a very loud crash was indicative of someone who was not aware of their surroundings or their environment, and that the cause of such an accident was most likely impairment caused by alcohol in that person's system.

¶ 8. Defense counsel objected to Dr. Nierenberg's opinions, contending that they were outside the scope of his expertise because he was not an accident reconstruction expert. The trial court allowed the testimony, holding that the jury could accept or reject Dr. Nierenberg's opinion and that it did not "think this is the same as reconstructing how the accident occurred but why it occurred."

¶ 9. Defendant also objected to the trial court's jury instruction concerning the "death resulting" element of § 1210(f), set forth more fully below, and renewed his objection after the court read the jury charge.

¶ 10. Following the return of guilty verdicts on both counts, defendant moved for a new trial in part because of his claim that Dr. Nierenberg had testified beyond the scope of his expertise. The trial court denied the motion, stating that Dr. Nierenberg's testimony was not that of an accident reconstructionist but rather included logical inferences from the evidence presented at trial. The court held a sentencing hearing on July 30, 2015 after denying defendant's request for expert services at state expense and his motion for a continuance to allow presentation of the

4

testimony of his expert at sentencing. Following the hearing, the trial court sentenced defendant to two concurrent four-to-ten-year terms to serve.

¶ 11. On appeal, defendant challenges: (1) the trial court's jury instruction on causation, which he argues allowed the jury to find him guilty even if it found that his intoxication did not cause the victim's death; (2) the admission of Dr. Nierenberg's expert testimony about the effects of alcohol and his opinion that defendant's intoxication caused the accident; and (3) the court's denial of defendant's request for necessary services for his sentencing hearing.

## II. Jury Instructions

¶ 12. The trial court's instruction on causation read as follows:

> The last essential element is that [defendant's] operation of his motor vehicle while under the influence of intoxicating liquor caused the death of [the victim]. You must conclude that but-for [defendant's] operation of his motor vehicle while under the influence of intoxicating liquor [the victim's] death would not have occurred. The State must have proven that [defendant's] acts produced [the victim's] death in a natural and continuous sequence, unbroken by an efficient intervening cause. An efficient intervening cause would be an unexpected individual force that broke the connection between [defendant's] acts and the resulting death.

(Emphasis added).

¶ 13. Defendant contends that the trial court's instructions erroneously permitted the jury to find him guilty of causing the victim's death without finding that intoxication or impaired operation had any role in the accident. Specifically, defendant argues that 23 V.S.A. § 1210(f)(1) requires that the State prove that a defendant's intoxication was a but-for cause of the death of another person while the defendant operated a motor vehicle and that the jury instructions did not meet this requirement. Defendant suggests that, given the trial court's instruction on causation, a reasonable juror who concluded that the State had met its burden of proof that defendant was under the influence of intoxicating liquor could have also concluded that a conviction under § 1210(f)(1) required only that the State prove that the accident and the victim's death occurred simultaneously while defendant operated his vehicle under the influence.

5

¶ 14.   We agree with defendant's assertion that the State must prove direct causation between the defendant's <u>intoxication</u> and the victim's <u>death</u>.  See <u>State v. Papazoni</u>, 157 Vt. 337, 338-39, 596 A.2d 1276, 1276-77 (1991).  We do not agree, however, that the challenged jury instruction allowed the jury to convict defendant without requiring the State to meet its burden of establishing that causation.

¶ 15.   With respect to the requirements of the "death resulting" element, we interpret the statute without deference to the trial court.  <u>State v. Richland</u>, 2015 VT 126, ¶ 6, 200 Vt. 401, 132 A.3d 702 (2015).  When interpreting a statute, our goal is to effectuate the intent of the Legislature by first looking to the plain, ordinary meaning of the statute.  <u>State v. Wainwright</u>, 2013 VT 120, ¶ 6, 195 Vt. 370, 88 A.3d 423 ("As we have repeatedly stated, in interpreting statutes our goal is to implement the intent of the Legislature.").

¶ 16.   Section 1210(f)(1) provides as follows: "If the death of any person results from a violation of section 1201 of this title, the person convicted of the violation shall be fined not more than $10,000.00 or imprisoned not less than one year nor more than 15 years, or both."  "Where the statute involves a specified result that is caused by conduct, it must be shown, as a minimal requirement, that the accused's conduct was an antecedent 'but for' which the result in question would not have occurred."  1 Wharton's Criminal Law § 26 (15th ed. 2016).  Here, the specified result is death caused by a violation of § 1201.  Thus, the accused's violation of § 1201 must have been a direct cause of the victim's death.  The statutory enhancement provided by § 1210(f) requires that the victim's death result from the DUI offense, not merely occur contemporaneously with it.

¶ 17.   We find support for this requirement in <u>State v. Yudichak</u>, where this Court held that the common-law standard of direct causation applies in cases of DUI with death resulting. 151 Vt. 400, 402-03, 561 A.2d 407, 409 (1989).  In <u>Yudichak</u>, we upheld a jury instruction that stated, in relevant part: "[I]f you also conclude that there was an independent intervening cause or

6

independent efficient intervening cause . . . that actually caused the accident, you must find the Defendant not guilty, even though you're satisfied that he was operating either under the influence or in a careless and negligent manner." Id. at 403, 561 A.2d at 410 (alterations in original). We noted that "where defendant's unlawful act is established in the chain of direct legal causation he is criminally responsible for the course of events which naturally follow from that act, unless the act of another break[s] the chain of causation of the original negligent actor." Id. at 403, 561 A.2d at 409 (alteration in original) (quotation omitted). We further explained that "the natural result of unlawful driving may include failure to adequately respond to traffic conditions." Id. In State v. Martin, we clarified our holding in Yudichak, explaining that the "defendant's actions must be a cause, rather than the sole cause, of the accident." State v. Martin, 2007 VT 96, ¶ 40, 182 Vt. 377, 944 A.2d 867 (emphasis added).

¶ 18.  Our decision in State v. Papazoni, which also involved a vehicle-pedestrian collision, further supports the requirement for a causal nexus between the intoxication of the driver and the victim's death.  157 Vt. at 338, 596 A.2d at 1276-77.  In recognizing that a pedestrian's suicidal act—stepping in front of the car—would break the chain of causation required under the statute, we stated that "[a]lthough the evidence of causation—the nexus between defendant's intoxicated state and the collision—was not strong, taken in the light most favorable to the State and excluding modifying evidence, there was sufficient evidence to fairly and reasonably support a finding of proximate cause beyond a reasonable doubt." Id. at 338, 596 A.2d at 1276.

¶ 19.  Accordingly, a jury instruction concerning § 1210(f)(1) must require findings that: (1) the defendant operated a vehicle on a highway; (2) he or she did so while under the influence of intoxicating liquor; and (3) his or her intoxication while operating the vehicle caused the victim's death.  A mere violation of §1201, standing alone, is insufficient to meet the requirement that the death result from the violation of the statute.  For example, an intoxicated driver lawfully stopped at a red light would be in violation of the DUI statute, but the driver's intoxication would

not have played a part in the victim's death if the driver's car were struck from behind by another car that did not heed the red light, causing the death of the driver's passenger. In that case, the driver's intoxication would not be a cause of the victim's death, even though the accident occurred when the driver was operating a vehicle while intoxicated. There must be a causal link between intoxication and death for the death to have "resulted from" driving while intoxicated pursuant to § 1210(f).

¶ 20. The manner of operation while in an intoxicated condition may provide a sufficient causal connection, however. See Papazoni, 157 Vt. at 339, 596 A.2d at 1277 ("[T]he evidence points persuasively to fault on defendant's part in failing to see and appreciate the decedent's plight and to take defensive measures to avoid hitting her."); see also Pollard v. Virginia, 455 S.E.2d 283, 286 (Va. 1995) ("The evidence . . . was sufficient to prove that [defendant's] intoxication caused him to operate his vehicle in a manner that resulted in [the victim's] death.").

¶ 21. Although we agree with defendant that the "death resulting" element requires a finding that defendant's intoxication was a but-for cause of the victim's death, we do not agree with his argument that the trial court's jury instruction failed to convey this causation requirement.

¶ 22. We review jury instructions in their entirety to determine if they "sufficiently guided the jury" and did not prejudicially impact its deliberations. State v. Muscari, 174 Vt. 101, 109, 807 A.2d 407, 414 (2002). The standard of review is whether, "taken as a whole," and not piecemeal, "the instructions . . . breathe the true spirit of the law, such that the jury has not been misled." Id. We will reverse a conviction only if the charge undermines confidence in the jury's verdict. State v. Brown, 2005 VT 104, ¶ 43, 179 Vt. 22, 890 A.2d 79.

¶ 23. Reviewing the challenged instruction as a whole, it is clear that the jury was asked to determine whether the victim's death would have occurred but for defendant's acts. Those acts were driving and being under the influence of intoxicating liquor. The instruction properly articulated the direct causation element of § 1210(f)(1), as it required the jury to find but-for

8

causation between defendant's conduct—both operating a vehicle and doing so while under the influence of intoxicating liquor—and the victim's death. While the causation element could have been more clearly articulated, the jury charge, when viewed as a whole, properly conveyed the requirement under § 1210(f) that there be a causal nexus between operation, intoxication, and death, unbroken by any intervening cause. We therefore discern no basis to reverse based upon the jury instructions.

## III. Expert Testimony

¶ 24. Next, defendant contends that the trial court abused its discretion and prejudiced his case when it allowed Dr. Nierenberg's testimony. Defendant argues that Dr. Nierenberg is not an expert in alcohol, and thus his testimony as to whether defendant was under the influence of alcohol at the time of the accident was outside the scope of his expertise. Defendant also argues that Dr. Nierenberg is not an accident reconstructionist, and therefore his opinion as to the cause of the accident was also outside the scope of his expertise. The State maintains that Dr. Nierenberg is qualified as an expert concerning absorption and elimination of alcohol, which allowed him to provide expert testimony as to defendant's BAC at the time of the accident, and that the trial court acted within its discretion when it admitted Dr. Nierenberg's testimony concerning causation.

¶ 25. Under Rule 702 of the Vermont Rules of Evidence, "a witness qualified as an expert by knowledge, skill, experience, training, or education," may testify "in the form of an opinion or otherwise" if his or her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" as long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Our rule is substantively identical to the federal rule and codifies the factors set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), which established the preeminent standard for admissibility of expert testimony and were adopted by this Court in State

v. Brooks, 162 Vt. 26, 643 A.2d 226 (1993).[3] See Scott v. Scott, 2013 VT 103, ¶ 10, 195 Vt. 330, 88 A.3d 1173 (stating that Daubert factors "are not exhaustive, and a trial court has broad discretion to determine, on a case-by-case basis, whether some or any of the factors are relevant in evaluating the reliability of expert evidence before it" (quotation omitted)).

¶ 26.    "The Daubert trilogy created a flexible standard intended to keep misleading 'junk science' propagated primarily for litigation purposes out of the courtroom while simultaneously opening the door to well-reasoned but novel scientific or technical evidence." 985 Assocs., Ltd, 2008 VT 14, ¶ 8. Vermont trial judges "must now act as gatekeepers who screen expert testimony ensuring that it is" both reliable and relevant. USGen of New England v. Town of Rockingham, 2004 VT 90, ¶ 19, 177 Vt. 193, 862 A.2d 269. Trial courts must therefore balance the Daubert factors with their "broad discretion to determine, on a case-by-case basis, whether some or any of the factors are relevant to evaluating the reliability of expert evidence before the court." 985 Assocs., Ltd., 2008 VT 14, ¶ 8.

¶ 27.    The trial court's decision to admit or exclude evidence is "highly discretionary" and will be reversed "only where discretion has been abused or withheld and prejudice has resulted." Griffis v. Cedar Hill Health Care Corp., 2008 VT 125, ¶ 18, 185 Vt. 74, 967 A.2d 1141. "When reviewing a trial court's decision to either admit or exclude expert testimony we consider whether the judge's decision was made for reasons clearly untenable or was unreasonable." USGen of New England, 2004 VT 90, ¶ 24. Absent a clear showing of judicial error, we will affirm the trial court's decision to admit or exclude the proffered testimony. State v. Parker, 149 Vt. 393, 400-01, 545 A.2d 512, 517 (1988).

---

[3] In Daubert, the U.S. Supreme Court held that Federal Rule 702 superseded the traditional test for admissibility of expert testimony set forth in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). 509 U.S. at 587-89. Daubert created "a flexible standard requiring only that expert testimony be both relevant and reliable to be admissible." 985 Assocs., Ltd. v. Daewoo Elecs. Am., Inc., 2008 VT 14, ¶ 6, 183 Vt. 208, 945 A.2d 381 (citing Daubert, 509 U.S. at 588-89).

¶ 28. The opinions proffered by the State's expert do not represent the type of "junk science" Daubert intended to thwart; rather, Dr. Nierenberg's testimony was supported by his qualifications as an experienced clinical pharmacologist and toxicologist whose work focuses on the effects of drugs and medications, including the pharmacodynamics of alcohol. Furthermore, Dr. Nierenberg detailed how his understanding of the effects of alcohol on the human body and brain, including the rates of elimination, led to his opinion that the most likely cause of an accident under the circumstances of this case was defendant's driving while intoxicated.

¶ 29. Defendant argues that Dr. Nierenberg's lack of familiarity with leading names in the field of the study of blood alcohol reflects his lack of qualifications as an expert in the area of blood-alcohol study. The standard under Rule 702 does not establish a threshold requiring familiarity with leading experts in the field; rather, it requires that the expert's testimony be both relevant and reliable. See 985 Assocs., Ltd., 2008 VT 14, ¶ 6 (citing Daubert, 509 U.S. at 588-89). As noted above, the trial court has broad discretion to determine, on a case-by-case basis, whether to admit expert testimony. Id. ¶ 8. We are not persuaded that the trial court abused its discretion in determining that Dr. Nierenberg's testimony was sufficiently reliable for the jury to consider it. The lack of familiarity with names the defendant asserts are leading names in the field may be of value in determining the weight to give to the expert's opinion, but it does not necessarily demonstrate a lack of subject-matter expertise that disqualifies an expert's opinion.

¶ 30. Furthermore, we are not persuaded that the trial court's decision to allow Dr. Nierenberg to testify as to causation, which defendant argues is outside the scope of his expertise as a pharmacologist and toxicologist, was an abuse of discretion. Dr. Nierenberg's expertise is on the effects of drugs, including alcohol, on the human body and brain. He testified that in his opinion, where a driver fails to see a pedestrian and then does not automatically brake, steer away, or slow down after a very loud crash, it is indicative of someone who is not aware of his

11

surroundings or their environment. He further testified that the cause of such conduct in this case was most likely impairment resulting from alcohol in the driver's system.

¶ 31. Defendant argues that such testimony is within the expertise of an accident reconstructionist, not a pharmacologist. The trial court disagreed and concluded that the testimony was sufficiently reliable to meet the requirements of Rule 702. We agree. An expert need not be an accident reconstructionist to testify concerning a motor vehicle accident. Cf. Barber v. LaFromboise, 2006 VT 77, ¶ 25, 180 Vt. 150, 908 A.2d 436 (allowing gastroenterologist to testify as to his opinion whether automobile accident could have caused plaintiff's alleged injuries based on his experience with trauma patients). Dr. Nierenberg's testimony was not as an accident reconstructionist; rather, it was as a pharmacologist offering his opinion as to whether a person acting in a certain way displayed characteristics of impairment. This testimony was within his area of expertise, and the trial court did not abuse its discretion in so concluding.

IV. Denial of Necessary Services

¶ 32. Finally, defendant argues that the trial court abused its discretion by denying him necessary services for the sentencing hearing in the form of expert testimony and that the denial of those services was prejudicial insofar as the court at sentencing relied heavily on factors that the expert would have addressed. In response to this argument, the State does not defend the court's determination that defendant was not a needy person entitled to services, but rather argues that defendant was not prejudiced by the ruling because the court acted within its discretion in denying defendant's motion to continue the sentencing hearing to allow the expert to prepare a report and testify. In response to the State's position, defendant argues in his reply brief that, given the circumstances of this case, the trial court abused its discretion by denying the continuance that would have given him the opportunity to present mitigation testimony from his expert at sentencing. To fully address these issues, we set forth below a more detailed history of the relevant procedural facts.

¶ 33.    Following the jury verdict in late March 2015, defendant moved for a new trial, and also for review of his bail and conditions of release.  When the court denied the motion for bail review, defendant appealed.  He simultaneously moved for public defender services, representing in an affidavit dated April 8 that he had exhausted his funds.  The trial court found that defendant was a needy person and granted his request for a public defender for the bail appeal, subject to a substantial copayment.

¶ 34.    On May 11, 2015, this Court issued its decision on defendant's bail appeal, and shortly thereafter the trial court denied defendant's motion for a new trial.  The trial court thereupon ordered a presentence investigation (PSI) report, to be completed by June 25, 2015.

¶ 35.    In mid-June, defense counsel filed a formal motion to withdraw and a request for appointment of a public defender to assist defendant in all further proceedings, explaining that defendant had no income or remaining ability to pay for defense services.  Counsel noted that he had discussed with defendant the idea of obtaining an evaluation from a "qualified mitigation expert for use at his sentencing."  Defendant's accompanying financial affidavit stated that he was incarcerated and unemployed; that his only major asset, the family home, had zero equity; that household expenses significantly exceeded income (from a cohabitant); and that he had about $6000 in a checking account.  The court clerk determined that defendant was financially eligible, subject to a required copayment toward the cost of public defender services.

¶ 36.    In late June, the trial court denied defense counsel's motion to withdraw, citing the "length of time, number and nature of the proceedings that counsel has been representing Defendant, his familiarity with the case and the fact that all that remains is the sentencing hearing."  The court noted that counsel's interest in retaining the services of an expert did not alter its conclusion, observing that whatever "this 'qualified mitigation expert' would have to offer at sentencing, Defendant has waited until three months after the jury's verdict and one month after

13

the hearing on his post-trial motions to indicate that consideration is being given to obtaining such an expert."

¶ 37. Shortly thereafter, on July 1, 2015, defense counsel filed a "motion for necessary services under 13 V.S.A. § 5231(a)(2)." Because the requested services exceeded $1500, and because the statute requires that any request for services costing more than $1500 per item be approved by the court, this motion was directed to the court. Defendant did not complete a new financial affidavit; he had just been found to be needy only two weeks before. Instead, he referenced and incorporated by reference his affidavits from April and June of 2015.

¶ 38. In the motion, counsel explained that defendant was seeking payment specifically for the services of Dr. Thomas Powell, a licensed psychologist with whom counsel had previously consulted on defendant's state of mind at the time of the offense. Counsel further explained that Dr. Powell would conduct a forensic evaluation, psychological testing, and a risk assessment, from which he would provide a written report that would address defendant's alcohol history and other risk factors and "present an explanation for [defendant's] failure to remain at the scene following the accident, based upon his expertise as [a] psychologist." Counsel requested payment of $3000 for Dr. Powell's services and represented that the Defender General had been consulted and agreed that the services were necessary and appropriate if defendant was found to be indigent. Counsel stated that Dr. Powell's report could be ready for a sentencing hearing in September 2015, two months hence.

¶ 39. The trial court denied the request for State payment of Dr. Powell's services on the same day that the services were requested—July 1. In a brief entry order, the court stated that defendant's financial affidavit disclosed $6000 in cash, which "disqualifies him as a financially needy person," and also noted certain "unexplained monthly expenses of $650" and an "unusually high monthly fuel expense." Also that same day, the court scheduled defendant's sentencing hearing for July 30, 2015.

14

¶ 40. Defendant filed a timely appeal of the court's denial of public-defender services pursuant to 13 V.S.A. § 5236(c), which provides that, after an initial determination of need, "the applicant, the State, or the Office of the Defender General may appeal the determination to a single justice of the Supreme Court of this State, in accordance with the rules of the Supreme Court." While the appeal was pending, defendant moved to continue the sentencing hearing scheduled for July 30 on the ground that, "assuming a speedy and favorable determination of the issue on appeal," Dr. Powell's report would not be available until September.

¶ 41. On July 21, 2015, the trial court denied defendant's motion to continue the sentencing hearing to allow his expert time to produce a report and testify, citing two factors. First, the court expressed doubt as to the relevance of Dr. Powell's evaluation, stating:

> The PSI already contains a risk assessment of Defendant (low risk) and any history of alcohol use as reported by Defendant himself. It is not appropriate for a psychologist to make sentencing recommendations. Any "explanation" Dr. Powell may present for Defendant's failure to remain at the scene would come from the Defendant giving him that explanation and is not the subject of expert testimony. Defendant may provide that explanation himself at the sentencing hearing, either by testifying or during his allocution.

In addition, the court observed that defendant had "waited until three months after the trial and one month after the denial of his motion for new trial to consult with a 'mitigation expert,' " and declined to delay the hearing to September, "given the above history of this case."

¶ 42. One day later, on July 22, 2015, the trial court docketed a single-justice decision from this Court summarily affirming the trial court's denial of defendant's request for services based on defendant's submitted financial information.

¶ 43. The sentencing hearing occurred as scheduled one week later, on July 30, 2015. As defendant had anticipated, his conduct and his state of mind following the accident proved to be highly relevant. Without its expert, the defense had little to say on the subject, which formed a significant basis of the State's argument for a lengthy prison term. The State argued that the

15

"egregious nature" of defendant's decisions before and especially after the accident required a "strong punitive response." Defendant's post-accident conduct also proved to be a critical component of the trial court's sentencing decision. Indeed, the trial court was highly critical in assessing defendant's post-accident conduct, finding that defendant had betrayed both "a legal and moral responsibility to assist those we injure," and that he was motivated solely by "self-interest and self-preservation."

¶ 44. Against this factual backdrop, we consider defendant's claims of error regarding the trial court's denial of his request for necessary services. Defendant maintains that the trial court abused its discretion in rejecting his request for State payment of services on the ground that he was not a "needy person," and that the court further erred in denying his motion for a continuance where the record showed that the services requested were essential to his attempt to demonstrate mitigating factors (or to minimize aggravating factors) at sentencing.

¶ 45. Although the actual ruling defendant has appealed involves the trial court's determination that he did not qualify for necessary services, the State's response to defendant's arguments concerning this ruling compel us to address two preliminary issues: (1) whether we have jurisdiction on appeal to review the ruling, given that it was affirmed by a single justice of this Court prior to sentencing; and (2) whether the trial court's denial of defendant's motion to continue the sentencing hearing to allow defendant the opportunity to present the testimony of his expert provides an alternate basis for affirming the sentence.[4]

A. Reviewability of Indigency Determination following Sentencing

¶ 46. The process for seeking a determination of financial need for legal services is set forth by statute and administrative order. An initial determination of financial need is made by the

---

[4] As noted, defendant's claim that the court erred in denying his motion to continue was raised for the first time in his reply brief, but in response to the State's assertion that he suffered no prejudice as a result of the financial ruling due to the trial court's ruling on the motion.

clerk of the superior court or any other officer of the court, with "review of the initial determination by the presiding judge of the trial court." 13 V.S.A. § 5236(c). From that determination, "the applicant, the State, or the Office of the Defender General may appeal . . . to a single justice of the Supreme Court of this State, in accordance with the rules of the Supreme Court." Id.

¶ 47.    Pursuant to this statute, this Court promulgated Administrative Order 4, § 5, which in relevant part, details the process for determining financial need for legal services. Under the administrative order, if a person is determined not to be needy by the court clerk or other judicial officer, "the court clerk shall inform the person of the right to have the determination reviewed by the presiding judge of the trial court and to appeal the determination to a single justice of the Supreme Court by filing a complaint about such determination with the Clerk of the Supreme Court pursuant to § 5(k) herein." A.O. 4, § 5(j). Subection 5(k) provides that within seven days of the issuance of the presiding judge's review of the determination of financial need, "the applicant, the state, or the office of the defender general may file an appeal of the determination or order in accordance with § 5(l) of this Administrative Order." Subection 5(l) provides that the clerk of this Court shall forward an appeal from a determination of financial need "to the associate justice assigned to the area in which the trial court is located . . . or such other justice as may be designated by the Chief Justice." The subsection further provides that "[s]uch justice shall make a determination, with or without a hearing, as to the merits of the complaint" by either: (1) "reject[ing] the complaint by a letter to the complaining party stating the reasons for such rejection"; (2) ordering the provision of legal services; or (3) taking "any other action to effectuate the purposes of this order." A.O. 4 § 5(l).

¶ 48.    The statute and administrative order make it clear that the determination of need should be made upon request before or during the trial court proceedings, as opposed to on direct appeal after the trial court proceedings have concluded. An appeal of the initial determination of need for legal services at trial must be made within seven days of that determination. This short

17

time frame for appeal from the initial determination makes sense. The applicant is seeking legal services for the trial court proceedings at hand, and thus it would not make sense to reserve final resolution of a determination of the applicant's entitlement to those services until after completion of the trial court proceedings, which would create the potential for judicial inefficiency. In short, the Legislature in the applicable statute, and this Court by rule pursuant to the legislative directive in that statute, have provided for review of a determination of financial need for legal services immediately following that determination, rather than deferring appellate review on these issues post-judgment.

¶ 49. We further note that a defendant denied necessary services as the result of a decision by a single justice may seek further review of that decision by the full Court pursuant to Vermont Rule of Appellate Procedure 27(c), which provides: "The full Court may review the action of a single justice." As the U.S. Supreme Court stated in construing the federal rule upon which our Rule 27 is based, see V.R.C.P. 27, Reporter's Notes (stating that V.R.C.P. 27 "is substantially identical to Federal Appellate Rule 27"), "even when individual judges are authorized under the Rules to entertain certain requests for relief, the court may review their decisions," thereby reinforcing the notion that decisions made by individual judges "should be regarded as an action of the court itself and not of an individual judge." Hohn v. United States, 524 U.S. 236, 244-45 (1998); see 16AA C. Wright et al., Federal Practice and Procedure § 3973.3, at 209 (4th ed. 2008) ("Any action that a single judge takes can be reviewed by the court, on motion by the aggrieved party."). Thus, in a situation in which an applicant believes that a single justice has erred in making a financial-need determination, the applicant may seek timely full-Court review, which may or may not be granted. While a defendant may not have a right to full-Court review of a single

18

justice's determination as to financial need, he or she certainly has a right to request that the single justice's determination be reviewed by the full Court.[5]

¶ 50. We recognize that a determination of financial need, albeit a relatively straightforward factual assessment of income and assets, has the potential to implicate a defendant's right to counsel and thus is a matter of significance to criminal defendants. Indeed, a decision granting or denying public defender services could play a critical or even determinative role at trial or sentencing. See Ake v. Oklahoma, 470 U.S. 68, 77 (1985) (holding that due process "entitles indigent defendants to" be provided with "the basic tools of an adequate defense" or appeal (quotation omitted)); see also Moore v. State, 889 A.2d 325, 337 (Md. 2006) (stating that "majority of courts have concluded that Ake extends beyond psychiatric experts" and applies to non-capital cases). For these reasons, we reiterate that defendants have the opportunity to seek timely full-Court review, via V.R.A.P. 27(c), of a single justice's determination of financial need.

¶ 51. For the reasons stated above, we conclude that defendants may not obtain review by this Court on direct appeal following conviction and sentencing of a determination of financial need made during the trial court proceedings. There is an opportunity for full-Court review of a

---

[5] In at least two published decisions, this Court has reviewed a determination of financial need for legal services. In State v. Bailey, 165 Vt. 579, 682 A.2d 1387 (1996) (mem.), this Court reversed the trial court's determination that the defendant was not a needy person after the matter was referred by a single justice to the full Court to construe a new amendment to the public defender statute. In State v. Higginbotham, 174 Vt. 640, 641, 816 A.2d 547, 550 (2002) (mem.), this Court considered and affirmed on interlocutory appeal—on the ground that the defendant was not a needy person—the trial court's denial of expert legal services for the defendant. The defendant filed the interlocutory appeal after missing the seven-day deadline for appeal to a single justice set forth in Administrative Order 4, § 5(l). As we explained in the decision, we granted permission to file the interlocutory appeal pursuant to Vermont Rule of Appellate Procedure 2 in "the interests of judicial economy" because of the State's concession "that defendant could have reapplied [for the services] to the [trial] court and then filed a timely appeal" to a single justice. Id. at 642, 816 A.2d at 550. What these decisions have in common, in contrast to the instant appeal, is that the determinations of financial need were resolved in a timely manner so that the determinations could be implemented in the trial court proceedings for which the services were requested.

single-justice determination of financial need made before or during trial pursuant to V.R.A.P. 27(c).[6]

## B. Denial of Continuance

¶ 52. As noted, the State argues that defendant was not prejudiced by the denial of necessary services[7] because, even if the motion for state payment of the services had been granted, the defense would have been unable to present the expert testimony at the sentencing, given the trial court's denial of his motion to continue. The State's argument is unpersuasive for two reasons. First, it rests on the assumption that even if the single-justice review had reversed the trial court and found defendant eligible for necessary services, the sentencing hearing would have proceeded without the expert testimony because of the court's denial of defendant's motion to continue. But the trial court scheduled the sentencing hearing upon denying defendant's request for necessary services and then three weeks later denied his motion to continue. If the motion for necessary services had been granted, the trial court may well have granted the motion to continue. Thus, defendant's approach to the sentencing hearing and his response to the trial court's denial of his

---

[6] We acknowledge that although Rule 27(c) refers to an "action" of a single justice, the rule is titled "MOTIONS," and thus, prior to this decision, defendants, including this defendant, may not have been on notice of the opportunity to seek full-Court review of a single justice's financial need determination under Rule 27(c). We make clear in this opinion that an opportunity for such review is in fact available under Rule 27(c). Because we remand for resentencing on other grounds, as set forth below, and because defendant will have an opportunity to file a new request for services based on his current financial status, defendant was not prejudiced by any arguable lack of notice of his appellate rights.

[7] To obtain expert services at state expense pursuant to 13 V.S.A. § 5231(2), an applicant must "describe with some particularity how a legal expert would assist [the applicant] to prove his [or her] claims." In re Kimmick, 2013 VT 43, ¶ 15, 194 Vt. 53, 72 A.3d 337 (quotation omitted). As indicated above, defendant described the issues that his expert would address, and noted that the Defender General had agreed that the services were necessary. In denying defendant's motion to continue, based primarily on defendant's perceived delay in requesting the services, the trial court suggested that the proposed expert evidence would not be critical to its sentencing decision. The court's sentence, however, was based in significant part on the issues that defendant indicated the expert would address, most particularly explaining defendant's actions following the accident. Given these facts, we conclude that the requested services were necessary.

motion to continue were largely shaped by the unavailability of resources to develop the expert testimony.

¶ 53. Second, and perhaps more to the point, the ruling on the continuance motion exceeded the trial court's discretion. To be sure, scheduling decisions are committed to the sound discretion of the trial court so that it can manage its docket. See State v. Schreiner, 2007 VT 138, ¶ 14, 183 Vt. 42, 944 A.2d 250; State v. Jones, 157 Vt. 553, 559, 601 A.2d 502, 505 (1991). But when the trial court here addressed the motion to continue on July 21, it was balancing, on the one hand, a two-month delay in holding the sentencing hearing against, on the other hand, defendant's best chance of mounting a potentially viable case in mitigation at sentencing, where defendant faced the possibility of consecutive sentences totaling thirty years for his convictions.

¶ 54. Notably, the record does not support the trial court's suggestion that defendant engaged in the kind of undue delay that would warrant such a hard line on the sentencing date in a case such as this. Defendant's motion for a new trial was not denied until late May, the PSI report was not due to be completed until June 25, and the July 30 sentencing hearing had been scheduled only a few weeks before defendant's July 17 motion to continue. Throughout this period, at least as early as April 8, defendant's situation was complicated by the fact that he qualified for public defender services but was nonetheless represented in the trial court by private counsel. He lost more than two weeks in his failed effort to transition to a public defender pursuant to his private counsel's motion to withdraw and then his failed effort to secure necessary services. The request to delay sentencing for a few weeks to enable defendant to make other arrangements, if he could, to have his mitigation expert available at the hearing, should have been granted, especially where the lack of mitigation proved to be an important issue at sentencing. The failure to grant the continuance, in light of the determination that defendant was not financially needy, deprived defendant of the opportunity to present the mitigation expert using his own funds that the court found he had available.

21

¶ 55. Moreover, the trial court's substantial skepticism about the potential value of the mitigation expert, also cited as a factor supporting the court's denial of a continuance, does not support its ruling. The court suggested that it would be inappropriate for defendant's expert to make sentencing recommendations. But defendant's proffer was broader than that. Among other things, he represented that the expert could offer psychological insight into defendant's reaction after he hit the victim. The court's dismissal of any "explanation" that Dr. Powell might provide as essentially indistinguishable from defendant's own testimony or statement in allocution failed to recognize the expert nature of the potential testimony. Had defendant been able to hire the expert, the expert may not have been able to offer any psychological insight into defendant's conduct. Or the testimony may have been completely unpersuasive to the sentencing judge. But given defendant's seemingly inexplicable behavior after he hit the victim, his desire to develop expert testimony for his sentencing hearing to explain that behavior is reasonable. Given the fact that the trial court relied heavily on that behavior in sentencing defendant, we cannot accept the trial court's assumption that the yet-to-be developed expert opinion would not have added any value. Under these circumstances, the denial of the motion to continue was an abuse of discretion. Accordingly, a remand is necessary to afford defendant the opportunity to call his mitigation expert at sentencing should he choose to do so.

¶ 56. Because of the passage of time since defendant's last application for necessary services, the trial court on remand must give defendant an opportunity to file a new application for such services.

The convictions are affirmed. The sentence is vacated and the matter is remanded for resentencing to allow defendant sufficient opportunity to present expert mitigation testimony, either at his own expense or at state expense if he is found to qualify for necessary services upon any renewed application for such services pursuant to the guidelines set forth in Administrative Order 4, § 5.

_____
Associate Justice