hoingeNOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2024 VT 31

No. 23-AP-067

| | |
|---|---|
| P. Mark Potanas | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Washington Unit, |
| | Civil Division |
| | |
| Department of Corrections | January Term, 2024 |

Robert A. Mello, J.

Alison J. Bell of Langrock Sperry & Wool, LLP, Burlington, for Plaintiff-Appellee.

Charity R. Clark, Attorney General, and Laura C. Rowntree, Assistant Attorney General[1], Montpelier, for Defendant-Appellant.


PRESENT:  Reiber, C.J., Eaton, Carroll, Cohen and Waples,[2] JJ.


¶ 1.     **EATON, J.**   The Department of Corrections (DOC) appeals from a jury verdict in favor of plaintiff P. Mark Potanas on his claim under the State Employee Whistleblower Act, 3 V.S.A. § 973.  DOC argues that plaintiff did not engage in any "protected activity" under the Act, and thus, the trial court should have granted its request for judgment as a matter of law.  We agree, and we therefore reverse the trial court's ruling and remand for the court to vacate the jury's verdict and enter judgment for DOC.  Given our conclusion, we do not reach DOC's remaining argument

---

[1] Eleanor L.P. Spottswood, Solicitor General, and Emma Sandberg, Legal Intern, were on the appellant's brief.  David A. Boyd substituted as counsel and was on the appellant's reply brief. Laura Rowntree substituted as counsel for David Boyd.

[2] Justice Waples was present for oral argument but did not participate in this decision.

that the court erred in admitting comparator evidence, nor do we set forth below the evidence related to that issue. For the same reason, we do not respond to the dissent's analysis of this issue.

## I. Proceedings Below

¶ 2. The record indicates the following. Plaintiff was employed by DOC as the superintendent of Southern State Correctional Facility (SSCF). In January 2017, DOC terminated plaintiff from his position for cause after finding that he engaged in misconduct and gross misconduct. DOC determined that plaintiff "intimidated a health services professional into changing [her] clinical recommendations" for a seriously functionally impaired inmate from "segregation is contra-indicated" to "segregation is contraindicated for more than 14 days." He treated the health-services professional in a demeaning manner. DOC further found that plaintiff was unprofessional and disrespectful to the health-services professional's supervisor and had, on multiple occasions, attempted to assert control over the supervisor's staff's professional mental health assessments, which was outside the scope of plaintiff's authority. DOC considered this an example of a larger pattern of unprofessional behavior. It added that plaintiff's actions clearly influenced supervisors to also engage in behavior that had been determined as misconduct. DOC had no confidence in plaintiff's ability to perform his duties as superintendent. For these and other reasons, DOC terminated plaintiff from his position.

¶ 3. Plaintiff sued DOC, arguing that DOC improperly fired him in retaliation for engaging in activity protected by 3 V.S.A. § 973. That law prohibits the State from retaliating against an employee for:

> providing to a public body a good faith report . . . that alleges an entity of State government, a State employee or official, or a person providing services to the State under contract has engaged in a violation of law or in waste, fraud, abuse of authority, or a threat to the health of employees, the public, or persons under the care of the State.

Id. § 973(a)(1). Plaintiff sought reinstatement and damages.

2

## A. Legal Framework

¶ 4.     To place plaintiff's trial arguments in context, we begin with the legal framework governing his claim.  To establish a prima facie case, plaintiff needed to show "that [he] suffered an adverse employment action under circumstances [that] give rise to an inference of unlawful [retaliation]."  Hammond v. Univ. of Vt. Med. Ctr., 2023 VT 31, ¶ 25, __ Vt. __, 308 A.3d 421 (quotation omitted) (applying burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), in context of Vermont's Fair Employment Practices Act); Griffis v. Cedar Hill Health Care Corp., 2008 VT 125, ¶ 12, 185 Vt. 74, 967 A.2d 1141 (applying McDonnell Douglas test under whistleblower protection statute for healthcare employees).  Plaintiff could do so by showing that: "(1) [he] [was] engaged in a protected activity, (2) [his] employer was aware of that activity, (3) [he] suffered an adverse employment action, and (4) there was a causal connection between the protected activity and the adverse employment action."  Hammond, 2023 VT 31, ¶ 38 (brackets omitted); Griffis, 2008 VT 125, ¶ 12 (recognizing that plaintiff's prima facie case for retaliation must be established by preponderance of evidence).  If plaintiff establishes a prima facie case, the burden shifts to DOC to provide a legitimate, nonretaliatory reason for the adverse employment action.  Hammond, 2023 VT 31, ¶ 25.  If DOC does so, the burden shifts back to plaintiff to show "that the proffered reason is a mere pretext for retaliation."  Id. (quotations omitted); Griffis, 2008 VT 125, ¶ 12.

## B. Trial Proceedings

¶ 5.     At trial, plaintiff alleged that DOC retaliated against him based on his engagement in two activities.  First, he argued that he was retaliated against for notifying the State of an opportunity to save money on a building renovation project in 2016.  That project, carried out by a contractor, involved replacing the potable water pipes in SSCF's buildings.  Plaintiff had operational oversight of the project for DOC.  The project was funded by the Legislature and scheduled to be performed in two different budget years.  The first step was replacing the pipes in

3

three living units, which was to be followed by replacing the pipes in the "main core" of the prison facility. The contractor completed the initial stage of the project ahead of schedule, and asked if it could be provided the funds (approximately $500,000) to complete its work that year. The contractor indicated that if it could finish its work that year, rather than leaving and returning, it would save the State at least $250,000 to $300,000.

¶ 6. Plaintiff relayed this information to the director of SSCF, who thought it sounded like a good idea. The director later told plaintiff that they did not have the funds to finish the project that year; the DOC Commissioner similarly told plaintiff that they would not be "spending the money on that." Plaintiff then bumped into the commissioner of the Department of Finance and Management and told him about the potential for savings. The finance commissioner thought there were discretionary funds available and asked plaintiff to "send him the numbers." Plaintiff provided this information in an email to the SSCF director, the commissioners of DOC, Buildings and General Services, and Finance, and other involved parties. Some email recipients were outside of plaintiff's chain of command. Within two weeks, plaintiff learned that the funds had been provided and that the project would be completed that year. Around this same time, the incident that formed the basis of the disciplinary investigation against plaintiff occurred, as did plaintiff's subsequent termination.

¶ 7. Plaintiff also claimed that he was retaliated against for advocating for more health staff at SSCF. Plaintiff testified to a staffing proposal that he was working on in August 2016, around the time that he was terminated. He testified to other instances when he had advocated for more mental health staff as well.

¶ 8. DOC moved for judgment as a matter of law at the close of plaintiff's case. It asserted that plaintiff was not a whistleblower with respect to the pipe replacement project because there was no "actual waste" in the project. Plaintiff agreed that he made a "report of potential waste," but maintained that "[t]he fact that [waste] didn't happen [wa]s not relevant to his report."

4

DOC also argued that plaintiff was not a whistleblower with respect to the level of mental health staffing at SSCF because it was a "widely known issue that people were paying attention to," he was expected to report on staffing issues, and "[i]t was a matter of [plaintiff's] opinion that there was insufficient staffing."

¶ 9.     The court denied the motion, finding the evidence sufficient to allow the jury to return a verdict in plaintiff's favor.  With respect to the pipe project, the court reasoned that it would have been a waste not to take into consideration the potential to save money.  It thus found plaintiff's report of potential waste sufficient to meet the definition of "protected activity" under the Act.  The court further found that plaintiff presented evidence that he complained to his superiors about the inadequacy of mental health staffing.  He made these complaints "over a significant period of time" and "right up until the time of his discharge."

¶ 10.    DOC renewed its decision for judgment as a matter of law at the close of the evidence, which the court denied.  The case was submitted to the jury, which returned a verdict for plaintiff.  This appeal followed.

## II.  Arguments on Appeal

¶ 11.    DOC argues that it was entitled to judgment as a matter of law because plaintiff did not engage in protected activity under the Whistleblower Act.  It maintains that reporting on potential waste, rather than actual waste, is not a protected activity.  DOC further asserts that reporting on a known problem, or disagreeing over how to resolve a known problem, is not protected activity.

¶ 12.    We review the trial court's ruling de novo, applying the same standard as the trial court.  Schaad v. Bell Atl. NYNEX Mobile, Inc., 173 Vt. 629, 631, 800 A.2d 455, 458 (2002) (mem.) (quotation omitted). Judgment as a matter of law is appropriate when, "taking the evidence "in the light most favorable to the nonmoving party, [and] excluding the effect of modifying evidence," "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the

5

nonmoving] party." Vincent v. DeVries, 2013 VT 34, ¶ 9, 193 Vt. 574, 72 A.3d 886. We agree with DOC that plaintiff failed to show that he engaged in protected activity under the Whistleblower Act. DOC was therefore entitled to judgment as a matter of law.

¶ 13. As indicated above, the Whistleblower Act prohibits the State from retaliating against an employee for providing to a public body a good-faith report:

> that alleges an entity of State government, a State employee or official, or a person providing services to the State under contract has engaged in a violation of law or in waste, fraud, abuse of authority, or a threat to the health of employees, the public, or persons under the care of the State.

3 V.S.A. § 973(a)(1).

¶ 14. Our goal in construing this statute is to implement the Legislature's intent, and "[t]he definitive source of legislative intent is the statutory language, by which we are bound unless it is uncertain or unclear." In re Bennington Sch., Inc., 2004 VT 6, ¶ 12, 176 Vt. 584, 845 A.2d 332 (mem.). We adhere to the "ordinary and usual meaning" of statutory terms unless "the objective of the legislation would be defeated by literal enforcement of statutory provisions." Town Sch. Dist. of Town of St. Johnsbury v. Town Sch. Dist. of Town of Topsham, 122 Vt. 268, 271, 169 A.2d 352, 354 (1961).

A. Reports of Potential Waste

¶ 15. The plain language of § 973(a)(1) does not encompass reports about the possibility of future waste. It applies to good-faith reports made to a public body alleging that a person or entity "has engaged . . . in waste." Id. (emphasis added). The verb tense used by the Legislature "expresses an action or state begun in the past and completed at the time of speaking . . . or continuing in the present." Present Perfect, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/present%20perfect [https://perma.cc/K43D-FZ5G]. In other words, there must be actual waste that has occurred at the time of the report,

6

which the employee is exposing. Plaintiff acknowledged below that he was seeking to avoid future waste and that any waste was in fact avoided.[3]

¶ 16. It makes sense that the Legislature considered an employee who exposes a past or ongoing wrong more likely to be subject to retaliation, and thus entitled to protection, than one who identifies potential waste or other potential wrongs that may still be avoided. By using the present-perfect tense, the Legislature chose to impose a clear limit on the reach of the statute.

¶ 17. The Idaho Supreme Court reached a similar conclusion in Van v. Portneuf Medical Center, 212 P.3d 982 (Idaho 2009), where it considered a retaliation claim under Idaho's Whistleblower Act. That Act defines protected activities in relevant part to include communications made in good faith about "the existence of any waste of public funds" and requires that the communication "be made at a time and in a manner [that] gives the employer reasonable opportunity to correct the waste." Id. at 988 (quotation omitted).

¶ 18. The employee in Van reported, among other things, that a proposed helicopter maintenance contract had "several loopholes by which [the vendor] could escape its maintenance responsibilities," and that "entering into the . . . contract amounted to a waste of public funds." Id. at 985. The court held that this was not protected activity because the employee's "focus was on potential future waste, rather than past or present waste." Id. at 989. It found that "this distinction is important because the relevant statute . . . [spoke] of the 'existence' of any waste of public funds, meaning an existing or present waste, not a potential future waste." Id. The court expressed its

---

[3] On appeal, plaintiff asserts that DOC did engage in waste when it refused his initial request to provide discretionary funds to complete the project, even though the funds were in fact made available. He conceded below, however, that he made a report of "potential waste," and we thus do not address this argument, which is both at odds with plaintiff's position below and appears to be raised for the first time on appeal. See In re White, 172 Vt. 335, 343, 779 A.2d 1264, 1270 (2001) (explaining that "[t]o properly preserve an issue for appeal a party must present the issue with specificity and clarity in a manner which gives the trial court a fair opportunity to rule on it" and "[w]e have repeatedly stressed that we will not address arguments not properly preserved for appeal").

7

concern about the far-reaching consequences of holding that the law protected "employee communications regarding potential waste that <u>may</u> occur in the future based on an employee's subjective beliefs." <u>Id</u>.

¶ 19.    We share this concern and reach a similar conclusion based on the language of our law.  To be afforded protection under the Act, the law plainly requires that an employee report that a person or entity "has engaged . . . in waste."  That requirement was not satisfied here.[4]

¶ 20.    Our conclusion is consistent with the statement of legislative purpose set forth in 3 V.S.A. § 971 ("A State employee, as a trustee and servant of the people, shall be free to report, in good faith and with candor, waste, fraud, abuse of authority, violations of law, or a threat to the health of employees, the public, or persons under the care of the State without fear of reprisal, intimidation, or retaliation.").  This provision does not vary the plain language of § 973, and it does not extend the protection of the Act, as plaintiff posits, to all employees who "speak up 'with candor' whenever and wherever they thought, in good faith, that the public trust was at risk."  We must give effect to the language used by the Legislature in § 973, which limits the scope of such protection to specific enumerated issues in the workplace.

¶ 21.    Plaintiff urges us to read § 973 to encompass reports of "known, specific, and imminent" waste based on the broad policy purposes of the Act.  We decline to read new language into the law, however, because it is not "necessary to make the statute effective."  <u>In re 204 N. Ave. NOV</u>, 2019 VT 52, ¶ 6, 210 Vt. 572, 218 A.3d 24 (quotation omitted)).  The statutory language here is clear and unambiguous, and, as indicated above, implementation of the plain language does not undermine the purpose of the statute.  The fact that the statute references "good faith" reports, moreover, does not establish that it encompasses reports of potential waste, as

---

[4]  The statutory language does not support the dissent's proposed interpretation, cf. <u>post</u>, ¶ 48 n.6, and we must respect the Legislature's clear choice on the issue of potential rather than actual waste.

plaintiff argues. Under the law, one must have a good-faith belief that waste "has" occurred. The fact that plaintiff may have reported the cost-saving potential to others outside his chain of command does not change this result. Given the particular language of our statute, we find unpersuasive the federal Whistleblower Act cases cited by plaintiff in support of his argument that reports of "real and immediate" or "imminent" harm should be protected. We conclude that the report made here about potential savings on the pipe project did not constitute protected activity under the Whistleblower Act.

### B. Mental Health Staffing Levels

¶ 22. We reach a similar conclusion with respect to plaintiff's complaints about mental health staffing. We find persuasive decisions from other states holding that reporting on a known problem, or disagreeing about how to resolve a known problem, is not protected whistleblower activity.

¶ 23. The Maine Supreme Court considered an issue similar to that presented here in Pushard v. Riverview Psychiatric Center, 2020 ME 23, 224 A.3d 1239. Specifically, it considered whether an employee's complaints about staffing decisions and policies constituted protected activity under the state whistleblower statute. The Maine whistleblower law protects an "employee, acting in good faith . . . [who] reports . . . what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." Id. ¶ 17 (quotation omitted). The employee there was the director of nursing at a psychiatric center who often disagreed with the staffing decisions made by his supervisor, the director of the facility. "The parties agree[d] that [u]nderstaffing was a persistent, ongoing problem at [the facility] for years," and "[t]he issue was publicly known and had been discussed by the media and the Legislature." Id. ¶ 3 (second alteration in original). The employee argued that he engaged in protected activity when he told his supervisor that "replacing mental health

9

workers with acuity specialists and replacing two full-time nurse educators with two part-time nurse educators compromised patient and employee safety." Id. ¶ 18 (footnote omitted).

¶ 24. The court rejected this argument, concluding that the employee's "staffing complaints were not whistleblower protected activity because he was not exposing a concealed or unknown safety issue. Instead, he was simply giving his opinion concerning his superior's attempts to address well-known problems related to staffing." Id. ¶ 19. The court explained that:

> an employee does not enjoy whistleblower protection simply because he disagrees with his employer about whether the employer's policy decisions cause safety concerns. Instead, a "report" under the [Maine Whistleblower Protection Act] is one that would bring the safety issue to the employer's attention, or is made to shed light on and in opposition to a safety-related concern.

Id. (quotations omitted).

¶ 25. The court concluded that the employee's conduct "d[id] not meet that standard because he was simply engaged in a policy dispute with his employer about how best to handle [the facility's] staffing issues." Id. As referenced above, the fact that the facility "was understaffed was known to the public, the Legislature, and [the facility's] employees," and "[e]ven if the specific staffing decisions about which [the employee] complained were not widely known, it [was] uncontroverted that [the employee] did not believe that he was making [his supervisor] or anyone else aware of anything they were not already aware of." Id. ¶ 21 (quotations omitted). "For this reason," the court concluded that the employee "was not reporting; he was complaining." Id.

¶ 26. Other courts have reached similar conclusions. See Forrester v. Ga. Dep't of Hum. Servs., 708 S.E.2d 660, 667 (Ga. Ct. App. 2011) (concluding that "to the extent the appellants claim to have disclosed something that was already widely known . . . this is [not] the type of communication encompassed by the whistle-blower statute"); Baptiste v. Mann, 861 S.E.2d 212, 218 (Ga. Ct. App. 2021) (citing Forrester for proposition that "[i]f the violation or noncompliance

10

is already widely known . . . the employee's disclosure of it does not constitute whistleblowing and is not protected by the [Georgia Whistleblower Act]"); Harper v. Univ. of Louisville, 559 S.W.3d 796, 802 (Ky. 2018) (similarly recognizing that " 'disclosure' of information which is public information or otherwise already widely known within the organization cannot qualify as a whistleblower disclosure" and Kentucky law "protects the whistleblower who exposes information not generally known").

¶ 27. We find these cases compelling here and hold that an employee who broadly discusses a widely known job-related issue is not making the type of report that the Whistleblower Act is designed to "encourage and protect."[5] Willis v. Dep't of Agric., 141 F.3d 1139, 1143 (Fed.

---

[5] This holding places a logical and reasonable limit on the reach of 3 V.S.A. § 973. A discussion of well-known work-related issues with various stakeholders, and the press, in the context of one's employment is not the type of activity that the Legislature sought to protect under the Whistleblower Act. Cf. post, ¶ 44. The dissent's approach would cast too wide a net; it would appear to apply to every employee who participated with plaintiff in discussions about staffing levels in prison facilities.

Plaintiff did not argue below that he was making corroborating reports and the cases cited by the dissent are inapposite. Post, ¶¶ 48-49. The primary cases on which the dissent relies involve factually distinct whistleblower provisions. Significantly, the laws discussed there reached only reports or disclosures of illegal acts. This limitation was cited by one of the courts as a reason why its interpretation of the law would not "convert everyday workplace disputes into whistleblower cases." People ex rel. Garcia-Brower v. Kolla's Inc., 529 P.3d 49, 59 (Cal. 2023) (quotation omitted). The court explained that the protections offered under the California law "apply only where the disclosing employee 'has reasonable cause to believe that the information discloses a legal violation.' " Id. (brackets omitted). Thus, it continued, "[t]his clause imposes a requirement of objective reasonableness and excludes from whistleblower protection disclosures that involve only disagreements over discretionary decisions, policy choices, interpersonal dynamics, or other nonactionable issues." Id.

Texas law similarly requires a "good faith report of a violation of law," as discussed in City of Ft. Worth v. Pridgen, 653 S.W.3d 176, 178 (Tex. 2022) (brackets omitted). The court emphasized that, to fall within its statute, reports must "convey information that exposes or corroborates a violation of law or otherwise provide relevant, additional information that will help identify or investigate illegal conduct." Id. at 184. It requires the conveyance of "information" and "fact," not "mere opinions or suppositions." Id. In that case, the court held that even if it was true that the employees in question were the first to bring a fellow employee's misconduct to their supervisor's attention, "the record show[ed] that at most [the employees] voiced an opinion to [their supervisor] about broadly known (indeed public) and easily verifiable information. Accordingly, there were no facts for [the employees] to expose or corroborate . . . . Since

11

Cir. 1998) (explaining that purpose of federal Whistleblower Protection Act "is to encourage government personnel to disclose government wrongdoing to persons who may be in a position to remedy the problem without fearing retaliatory action by their supervisors or those who might be harmed by the disclosures," but this does not include "[d]iscussion and even with disagreement with supervisors over job-related activities," which "is a normal part of most occupations").

¶ 28. The record here shows that the mental health staffing issues were widely known and discussed. Plaintiff advocated for more mental health staff throughout his time as superintendent, as did others. Plaintiff's supervisors shared his concerns and expressed support for a strong long-term mental health team. Plaintiff's supervisors sought out more information from plaintiff about his mental health staffing concerns at SSCF and scheduled meetings about the issue at his request. Plaintiff prepared and presented a slideshow about mental health staffing needs. Plaintiff recalled that some of the attendees, including the medical director, were pleased with the presentation. The Legislature was also concerned about meeting the mental health needs

---

'reporting' under the [Texas act] require[d], at a minimum, provision of information regarding illegal conduct, this type of communication [did] not suffice." Id. at 188.

As stated above, the staffing concerns in prison facilities, including SSCF, were well-known and shared by many, including plaintiff's supervisors. Addressing these concerns presented a complicated policy issue. See Edwards v. Commonwealth, 174 N.E.3d 1153, 1165 (Mass. 2021) (recognizing "that, in many routine policy disagreements, any given position might be characterized as creating a risk to public health, safety or the environment") (quotations omitted) (citing Chambers v. Dep't of Interior, 515 F.3d 1362, 1368 (Fed. Cir. 2008) (noting that "any policy decision related to the allocation or distribution of law enforcement funding . . . could potentially be said to create a risk to public safety")); see also Johnson v. Dist. of Columbia, 225 A.3d 1269, 1275 (D.C. 2020) (explaining that, while whistleblower act seeks to protect employees who report "waste, fraud, abuse of authority, violations of law, or threats to public health and safety," "the statute is not meant to be a weapon in arguments over policy or a shield for insubordinate conduct"; instead, "purported whistleblower must disclose such serious errors by the agency that a conclusion that the agency erred is not debatable among reasonable people") (quotations and citations omitted). As the Johnson court recognized, "[m]ere differences of opinion between an employee and an agency supervisor as to the proper approach to a particular problem or the most appropriate course of action do not rise to the level of gross mismanagement." Id. at 1277 (quotation omitted). These types of policy disagreements are not the type of "protected activity" that the Legislature sought to protect in the Whistleblower Act.

of incarcerated individuals during plaintiff's tenure as superintendent. Plaintiff spoke to the press about the issue as well.

¶ 29. Others within DOC also advocated for more mental health staff, including the former director of mental health services for DOC, the director of nursing services, the medical director, and other prison superintendents. These efforts included meeting and communicating with the director of facilities and the DOC Commissioner. There was also evidence that it could be difficult to find mental health staffers and questions about whether an increase in staff would necessarily translate into better care.

¶ 30. Plaintiff does not appear to take issue with the proposition that the staffing shortages were widely known and discussed. He instead argues that his reports were uniquely informed given his position as superintendent for a facility designed to house inmates with significant medical and mental health needs. Plaintiff's complaints about staffing levels were one of many voices on this subject, however, and the fact that he may have brought a unique perspective to this discussion does not undermine the conclusion that this issue was widely known, and therefore outside the scope of the Whistleblower Act. Because plaintiff failed to show that he engaged in protected activity under the law, DOC was entitled to judgment as a matter of law.

The trial court's denial of the Department of Corrections' motion for judgment as a matter of law is reversed and the case is remanded for the court to vacate the jury's verdict and enter judgment for the Department of Corrections.

FOR THE COURT:

_____
Associate Justice

¶ 31. **COHEN, J., dissenting.** The Court holds that a uniquely-situated employee's report of an ongoing threat to the health of individuals is not protected by the State Employee Whistleblower Act if the gist of the threat is "widely known." Ante, ¶ 27. In my view, this conclusion severely chills an employee's ability to report the extent to which conduct or inaction

13

will threaten the safety of the public, other state employees, or persons under the state's care. With the responsible public body deprived of the benefit of reports detailing how a generally known threat will materialize, it cannot make a properly informed decision on how to best address that threat. I cannot endorse this outcome. To implement a core purpose of the Act, good-faith reports that fall under its ambit should constitute protected activity even if those reports are corroborative. Therefore, I would hold that plaintiff engaged in protected activity when he repeatedly reported how inadequate mental health staffing led to ongoing and particularized threats to his staff and the inmates under the state's care. And because the jury issued a general verdict that did not distinguish between that protected activity and plaintiff's reports of waste, the judgment below must be affirmed. For these reasons, I respectfully dissent.

I. Plaintiff's Reports of Threats to Safety Caused by Inadequate Staffing

¶ 32. Before examining the merits of this appeal, it is imperative to provide context on plaintiff's employment and his reports on mental health staffing in a manner consistent with the governing standard of review. In an appeal brought from a motion for judgment as a matter of law under V.R.C.P. 50(a)(1), this Court must "consider the evidence in the light most favorable to [plaintiff], excluding the effect of modifying evidence." Foti Fuels, Inc. v. Kurrle Corp., 2013 VT 111, ¶ 10, 195 Vt. 524, 90 A.3d 885 (quotation omitted). So long as the evidence "may fairly and reasonably support all elements of the nonmoving party's claim, judgment as a matter of law is improper." Lasek v. Vt. Vapor, Inc., 2014 VT 33, ¶ 14, 196 Vt. 243, 95 A.3d 447 (quotation omitted).

¶ 33. Plaintiff began his employment with the Department of Corrections (DOC) in 1997 as a corrections officer. After holding various positions with DOC, plaintiff was eventually promoted in 2011 to superintendent of Southern State Correctional Facility (SSCF), having held various roles at SSCF since 2003.

14

¶ 34. SSCF was itself a unique facility. It was designed to house inmates with mental health issues as well as inmates experiencing other medical problems. Many individuals incarcerated at SSCF were experiencing mental health crises and posed a danger not only to themselves but also to others. During his time at SSCF, plaintiff became intimately familiar with the needs of the inmates and the staff servicing and treating those individuals. Over the course of many years at SSCF, including nearly six years as superintendent, plaintiff learned how inadequate staffing morphed into a developing and continuous threat to both inmates and staff.

¶ 35. Overall, plaintiff worked in various capacities at SSCF for nearly fourteen years. He was uniquely positioned to understand how insufficient mental health staffing threatened safety given his experience, background, and his status as superintendent. It follows that considerable weight could be assigned to his insight and perspectives regarding the operations of SSCF.

¶ 36. Plaintiff repeatedly sent reports to his superiors outlining the developing and ongoing threats posed by the lack of adequate mental health staffing. For instance, plaintiff reported to his direct supervisor about a staff assault at SSCF which, according to plaintiff, was a result of the absence of mental health clinicians. In another instance, plaintiff held a meeting with approximately twenty individuals to discuss the ongoing threat to safety posed by the lack of necessary mental health staff. During that meeting, he presented a year's worth of information he had gathered as SSCF superintendent and detailed how the lack of mental health staffing was continually jeopardizing the safe operation of the facility.

¶ 37. In a report sent to a number of individuals only months before his termination, plaintiff warned about the already-stretched mental health services that inmates were receiving after one mental health staff member was fired by DOC's contractor. The mental health staff were already "working at an unreasonable pace with no relief in sight." This followed another report to many of those same individuals, where plaintiff detailed the current status of inmates' mental health needs, the inadequacy of the staff to service those needs, and the number of deaths at SSCF

15

over several years. Plaintiff stated that the lack of adequate staffing would, "in my opinion, put the entire inmate population at risk."

¶ 38. Contrary to the majority's contention, much of these reports did not simply regurgitate the generally known issue that SSCF lacked adequate staff. Instead, many of plaintiff's reports detailed not only the specific threats posed by the lack of mental health staffing, but also the failure of DOC's contractors to provide SSCF with that necessary staff.

## II. Scope of Protected Activity Under § 973

¶ 39. Claims under 3 V.S.A. § 973 are governed by the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). At the initial stage, a plaintiff must establish a prima facie retaliation claim by showing that: "(1) the plaintiff engaged in a protected activity; (2) the employer was aware of the activity; (3) the plaintiff suffered adverse employment consequences as result of the activity; and (4) there was a causal connection between the activity and the consequences." Griffis v. Cedar Hill Health Care Corp., 2008 VT 125, ¶ 12, 185 Vt. 74, 967 A.2d 1141 (applying burden-shifting framework of McDonnell Douglas to whistleblower claim under 21 V.S.A. § 507). If a plaintiff establishes their prima facie case, "the burden of production shifts to the defendant, who must state legitimate, nonretaliatory reasons for the adverse employment action." Id. Should the defendant meet that burden, the analysis enters a third burden-shifting stage requiring the plaintiff "to prove by a preponderance of the evidence that the [defendant's] articulated reasons are pretextual." Id.

¶ 40. The majority's resolution of this appeal focuses on the very first element of the first stage—whether plaintiff's reports about ongoing and developing threats posed by mental health staff shortages were "protected activity."

¶ 41. Given that 3 V.S.A. § 973 is the operative source of what is "protected activity," whether reports are protected necessarily involves interpreting that statute. Our goal in doing so is to "determine the intent of the Legislature and implement that intent." Flint v. Dep't of Lab.,

16

2017 VT 89, ¶ 5, 205 Vt. 558, 177 A.3d 1080. The starting point of that inquiry is the statute's plain language. Id. The relevant portion of § 973 provides:

> A State agency, department, appointing authority, official, or employee shall not engage in retaliatory action against a State employee because the State employee . . . [p]rovide[s] to a public body a good faith report or good faith testimony that alleges an entity of State government, a State employee or official, or a person providing services to the State under contract has engaged in violation of law or in waste, fraud, abuse of authority, or a threat to the health of employees, the public, or persons under the care of the State.

3 V.S.A. § 973(a)(1).

¶ 42. The plain language governing when a report is protected is unmistakably clear. Broken down into core elements, a report must (1) be made in "good faith," (2) be provided to a "public body" as defined in 3 V.S.A. § 972(3), and (3) allege that one of the enumerated entities has, inter alia, engaged in conduct that threatens the health of employees, the public, or persons under the state's care.

¶ 43. Section 973 does not impose any additional showing beyond these three components. For instance, it does not require that a report must pertain to a threat not already known to the public body. Rather, § 973's plain terms give no indication that the Legislature intended to exclude reports merely because the report touches upon a well-known issue.

¶ 44. This interpretation of § 973 fits squarely within the Legislature's express intent to provide considerable protections to state employees. The Legislature made clear that the purpose of § 973 was broad and all-encompassing: As "a trustee and servant of the people," a state employee "shall be free to report, in good faith and with candor, waste, fraud, abuse of authority, violations of law, or a threat to the health of employees, the public, or persons under the care of the State without fear of reprisal, intimidation, or retaliation." 3 V.S.A. § 971. Reporting on the extent of such a threat, even if the general threat is already known to a public body, furthers the stated legislative objective. State Agency of Nat. Res. v. Parkway Cleaners, 2019 VT 21, ¶ 16,

17

209 Vt. 620, 210 A.3d 445 (requiring Court when interpreting statute to consider "[a]ll relevant parts of the applicable statutory scheme to create . . . a harmonious whole" (quotation omitted)).

¶ 45. A further reason to favor a broad interpretation is the remedial purpose of § 973. There is no doubt that the Act is remedial, especially in light of the Legislature's stated intent contained in § 971. Accord Harrison v. Granite Bay Care, Inc., 811 F.3d 36, 51 (1st Cir. 2016) (observing that Maine's whistleblower protection statute was "a remedial scheme to vindicate" against discharge in retaliation for reporting illegal acts); Killgore v. SpecPro Prof. Servs., LLC, 51 F.4th 973, 985 (9th Cir. 2022) (construing California Whistleblower Protection Act in manner "consistent with [its] broad remedial purpose" that "reflects the broad public policy interest in encouraging whistle-blowers to report unlawful acts without fearing retaliation" (quotation omitted)). As such, § 973 must be "liberally construed to accomplish [its] remedial purpose." Parkway Cleaners, 2019 VT 21, ¶ 16 (quotation omitted). Interpreting § 973 to include plaintiffs' reports on the threat posed by mental health staffing issues neatly conforms to that principle.

¶ 46. This should mark the end of the interpretative analysis of § 973. See In re 204 N. Ave. NOV, 2019 VT 52, ¶ 5, 210 Vt 572, 219 A.3d 24 ("If the plain language is clear and unambiguous, we enforce the statute according to its terms." (quotation omitted)). Under that statute's plain terms, any report that meets its basic requirements satisfies the "protected activity" element under McDonnell Douglas. There is nothing within the statute's language indicating that the Legislature intended to exclude reports detailing the extent to which a well-known issue risks the health of the public or persons under the state's care. Imposing such a limitation is atextual and at odds with how this Court typically interprets remedial statutes.

¶ 47. This plain reading is also, practically speaking, logical. Other courts have delineated prudential reasons for why a legislature would intend to protect all reports of threats to the safety of state employees or individuals under the state's care, even if the information is corroborative.

18

¶ 48.    In People ex rel. Garcia-Brower v. Kolla's, Inc., 529 P.3d 49 (Cal. 2023), the California Supreme Court addressed whether an employee who reported a potential wage law violation was protected under California's whistleblower retaliation statute, even though that information was already known to the employer. In answering that question, the court highlighted the importance of corroborating reports.[6]    It explained that if multiple disclosures lacked the necessary antiretaliation protection, "employers and government agencies would miss out on potentially corroborating information that may be valuable in investigating and confirming violations of the law." Id. at 57.  And absent that protection, "an employee who knows that his or her coworker has already disclosed a violation may be hesitant to disclose the same violation." Id. That stood in contrast to the benefits of protecting corroborating reports, as "an employee may reasonably feel more willing to approach an employer about workplace safety hazards, unpaid wages, or overtime violations knowing that his or her coworkers were also disclosing the same unlawful activity." Id.  When multiple employees make corroborating reports of a specific threat or legal violation, an employer will "be more likely to ameliorate violations, and less able to sweep them under the rug." Id.

¶ 49.    The value of corroborating reports was also examined in City of Fort Worth v. Pridgen, where the Texas Supreme Court interpreted a statute that, like § 973, protects a public employee "who in good faith reports" a violation of law.  653 S.W.3d 176, 183 (Tex. 2022).  The Pridgen court rejected the defendant's argument that "consistent reports add no benefit" and instead concluded that corroborative reports "may be equally helpful in ferreting out government

---

[6] Notably, the court in Kolla's also looked to the plain language of its statute, focusing on the operative term "disclose."  529 P.3d at 53.  It observed that "[a]lthough the term 'disclose' often refers to sharing previously unknown information, the word also means bringing into view in a particular context a type of information to which the discloser tends to have special access." Id.  This term could include a report "that calls attention to a legal violation or potential violation in the workplace," which is "the type of information to which an employee tends to have special access, whether or not any particular recipient of such information has prior knowledge." Id. at 54.

mismanagement to protect the public." Id. at 185 (quotation omitted). The court explained that corroboration "is eminently valuable when evaluating the reliability of an informant's tip." Id. "It is also common sense. Three consistent accounts of misconduct from three different sources represent far more compelling evidence of wrongdoing than a single report." Id. at 186. Thus, excluding such reports that may possess "additional evidence" from whistleblower protection would chill employees from sharing such information out of fear of retaliation. Id.

¶ 50. Applying those principles here, I would conclude that plaintiff's reports on inadequate mental health staffing held inherent value that warrant protection under § 973. As superintendent of SSCF and having worked at SSCF in various capacities for eight years before reaching that position, plaintiff held "special access" to the unique information concerning the ongoing threats posed by the lack of adequate mental health staffing. Kolla's, 529 P.3d at 54. Plaintiff was in an exceptional position to report on these threats given his access, experience, and grasp on the details of how these specific threats continued to materialize. His reports were not only valuable "additional evidence" but also compelling under the circumstances. Pridgen, 653 S.W.3d at 186 (holding corroborative reports are valuable evidence and warrant protection under Texas' whistleblower protection statute). Even assuming plaintiff's reports merely corroborated the well-known mental health staffing crisis, they could very well be invaluable to guiding the responsible public body to best address the resulting threat.

¶ 51. To reach a contrary conclusion, the majority relies on cases that are either unpersuasive or inapposite. The majority primarily relies on Pushard v. Riverview Psychiatric Center, where the Supreme Judicial Court of Maine examined a somewhat similar issue under Maine's whistleblower-protection act. 2020 ME 23, ¶¶ 17-19, 224 A.3d 1239. Pushard involved a plaintiff who made complaints that specific staffing decisions compromised patient and employee safety. The court concluded that these reports were not protected activity because the plaintiff "was not exposing a concealed or unknown safety issue." Id. ¶ 19. It pointed to the fact

20

that understaffing "was known to the public, the [l]egislature, and [his employer's] employees." Id. And it further observed that even if the specific staffing decisions which the plaintiff disagreed with were not "widely known," the plaintiff did not believe that he was reporting information that was not already known to the recipient. Id.

¶ 52.  I remain unconvinced by Pushard's reasoning.  Its holding—reports that do not expose a concealed or unknown safety issue are not protected activity—relies solely on two statements from two separate cases.  The first comes from Cormier v. Genesis Healthcare LLC, 2015 ME 161, 129 A.3d 944.  As noted in Pushard, Cormier "explained that an employee had presented evidence to survive a motion for summary judgment because she had shown facts sufficient to support a finding that [she] held a reasonable belief that staffing levels compromised the safety of the residents and that her complaints would bring the safety issue to [her employer's] attention."  Pushard, 2020 ME 23, ¶ 19 (quoting Cormier, 2015 ME 161, ¶ 12) (alteration and emphasis in original).  But whether a report brings a safety issue to an employer's attention is separate and distinct from the originality of the information itself.  Repeatedly reporting a safety concern brings as much attention to that issue as the first report.  For every report that a staffing issue is compromising safety, an employer must turn its attention to that issue.  Moreover, repeated reports draw even more attention to the issue at hand.  See Pridgen, 653 S.W.3d at 186 (observing that multiple reports of misconduct provide more credibility than isolated report).

¶ 53.  Pushard also cites to a single sentence from Harrison, 811 F.3d at 51.  Harrison addressed whether reporting misconduct as a part of an employee's normal job duties was protected under Maine's whistleblower protection act.  Pushard merely relied on Harrison's summation of Maine case law: Maine's whistleblower protection act applies only to reports that were "made to shed light on and in opposition to an illegal act or unsafe condition."  Pushard, 2020 ME 23, ¶ 20 (quoting Harrison, 811 F.3d at 51) (emphasis omitted).  But a report that sheds light on, and is made in opposition to, an unsafe condition can certainly include a report that pertains to

21

a well-known unsafe practice. Common sense dictates that a report can "shed light on" a widely known issue in many respects, such as expanding on how threats are developing and the extent to which the threat affects, in real time, the safety of staff and inmates. Pushard makes no attempt to explain why, as a matter of law, corroborating reports can never "shed light on" a publicly known issue.

¶ 54. There is yet an additional problem with Pushard, which was highlighted in Justice Jabar's dissent. Maine's construction of its whistleblower protection statute "has been guided by federal law." Currie v. Industrial Sec., Inc., 2007 ME 12, ¶ 13, 915 A.2d 400. As such, Justice Jabar noted Congress's 2012 amendment to the federal whistleblower statute which expressly provides that a disclosure is not excluded as "protected activity" merely because it "revealed information that had been previously disclosed." 5 U.S.C. § 2302(f)(1)(B); see Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, 126 Stat. 1465, 1466; Pushard, 2020 ME 23, ¶ 37 (Jabar, J., dissenting). Thus, "[t]he proposition that complaints about publicly known safety issues can never be protected activity has been expressly overruled by Congress." Pushard, 2020 ME 23, ¶ 37 (Jabar, J., dissenting).

¶ 55. The majority further relies on cases from the Georgia Court of Appeals and the Kentucky Supreme Court, where those courts interpreted their respective state whistleblower statutes to exclude disclosures of widely known information. See Forrester v. Ga. Dep't of Hum. Servs., 708 S.E.2d 660, 667 (Ga. Ct. App. 2011); Harper v. Univ. of Louisville, 559 S.W.3d 796, 802 (Ky. 2018). These cases are problematic for primarily two reasons.[7]

---

[7] There are other reasons why these cases are unpersuasive. For instance, the court in Forrester performed no legal analysis as to why "widely known" issues did not as a matter of law fall under its whistleblower statute. Instead, the court engaged in a perfunctory inquiry consisting of a single paragraph which concluded with the statement that it "[could not] say that this type of communication" was protected activity. 708 S.E.2d at 667. Likewise, in Baptiste v. Mann, the court did nothing more than rely on Forrester's single-sentence conclusion. 861 S.E.2d 212, 218 (Ga. Ct. App. 2021).

¶ 56. First, <u>Harper</u>'s holding on this topic is heavily dependent on a federal case that is no longer good law. <u>Harper</u> determined that the purpose of the Kentucky Whistleblower Act is to protect "employees who possess knowledge of wrongdoing that is concealed or not publicly known, and who step forward to help uncover and disclose that information." 559 S.W.3d at 801 (quoting <u>Davidson v. Com., Dep't of Mil. Affs.</u>, 152 S.W.3d 247, 255 (Ky. Ct. App. 2004)). <u>Davidson</u>, in turn, reached that conclusion by first observing that Kentucky looks to federal precedent for its own whistleblower statute. The <u>Davidson</u> court then adopted the holding of <u>Meuwissen v. Department of Interior</u>, 234 F.3d 9 (Fed. Cir. 2000): " '[a] disclosure of information that is publicly known is not a disclosure.' " <u>Davidson</u>, 152 S.W.3d at 255 (quoting <u>Meuwissen</u>, 234 F.3d at 13). <u>Harper</u> also relied on <u>Moss v. Kentucky State University</u>, 465 S.W.3d 457 (Ky. Ct. App. 2014), for the proposition that "the 'disclosure' of information which is public information or otherwise widely known within the organization cannot qualify as a whistleblower disclosure. The statute protects the whistleblower who exposes information not generally known." <u>Harper</u>, 559 S.W.3d at 802. <u>Moss</u>, in turn, relied on <u>Davidson</u>, and concluded without citation that an employee is protected only if they are the initial reporter. <u>Moss</u>, 465 S.W.3d at 459-60.

¶ 57. The common theme is <u>Meuwissen</u>, which is at the center of <u>Harper</u>'s holding. The problem, however, is that Congress expressly repudiated <u>Meuwissen</u> when it enacted the Whistleblower Protection Enhancement Act, labeling <u>Meuwissen</u> as "contrary to congressional intent for the [Whistleblower Protection Act]." S. Rep. No. 112-155, at 5 (2012), <u>as reprinted in</u> 2012 U.S.C.C.A.N. 589, 593; see also <u>supra</u>, ¶ 24. Both federal and state courts have recognized "that Congress (in passing the [Whistleblower Protection Enhancement Act]) explicitly superseded <u>Meuwissen</u>'[s holding]" that "disclosures of information already known are not protected." <u>Daniels v. Merit Sys. Prot. Bd.</u>, 832 F.3d 1049, 1055 (9th Cir. 2016) (quotation omitted); see also <u>O'Donnell v. Merit Sys. Prot. Bd.</u>, 561 Fed. App'x 926, 930 (Fed. Cir. 2014) (unpub. per curiam) (observing that enactment of Whistleblower Protection Enhancement Act, as codified in 5 U.S.C.

§ 2302(f)(1), represented Congress's "objection to the holding in Meuwissen . . . that disclosures of information already known are not protected" (quotation omitted)); Craig v. Not for Profit Hosp. Corp., 626 F. Supp. 3d 87, 105 n.12 (D.D.C. 2022) (same); Kolla's, 529 P.3d at 54-55 (same). Harper fails to reconcile this problem, and it provides no persuasive reasoning beyond citing to cases entirely reliant on Meuwissen.

¶ 58. Second, Harper and the other cases cited by the majority interpreted the term "disclosure" as contained in their respective statutes, a term absent from § 973. See Ga. Code Ann. § 45-1-4(d)(2) (2012) ("No employer shall retaliate against a public employee for disclosing a violation of or noncompliance with a law, rule, or regulation." (emphasis added)); Harper, 559 S.W.3d at 801-803 (interpreting "disclosure" as that term is defined in Ky. Rev. Stat. Ann. § 61.103(1)(a) (West 2024) and used in Ky. Rev. Stat. Ann. § 61.102 (West 2024)). "Disclosure" and "report" have materially distinct meanings. A "report" is defined as a "written account," a "[a] formal oral or written presentation of facts or a recommendation for action," Report, Black's Law Dictionary (11th ed. 2019), or simply "a usually detailed account or statement," Report, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/report [https://perma.cc/3APT-CBYA]. See In re Vt. Permanency Initiative, Inc. Denial, 2023 VT 65, ¶¶ 13-14, __ Vt. __, 312 A.3d 491 (looking to dictionary definition of term not defined in statute to ascertain term's plain and ordinary meaning). In contrast, "disclosure" has a far more limited reach: "[t]he act or process of making known something that was previously unknown; a revelation of facts." Disclosure, Black's Law Dictionary (11th ed. 2019) (emphasis added). As Pridgen observed, the definitional difference between the two terms is significant, leaving cases that define "disclosure" in a restrictive manner to be of little use in interpreting Vermont's statute. 653 S.W.3d at 185.

¶ 59. The distinction between these two terms is important given that the Vermont Legislature contemplated using "disclosure" in § 973. In the first draft of the Act, "disclosure"

24

appeared as the original term in place of "report." See H. Jour. 490, 2007-2008 Gen. Assem., Bien. Sess. (Vt. Apr. 1, 2008) (defining "protected activity" as "[p]roviding or disclosing information" of conduct that state employee reasonably believes is "a threat to the health of employees, the public or persons under the care of the state"). But eventually, the Legislature abandoned the "disclosure" language and replaced it with "report." This conscious decision was no mistake, especially given the presence of "disclosure" in other whistleblower statutes. See 21 V.S.A. § 507(b)(1) (prohibiting employer from retaliating against employee who "[d]iscloses or threatens to disclose . . . any activity . . . that the employee reasonably believes constitutes improper quality of patient care"); see also 9 V.S.A. § 5617(j)(1)(D) (prohibiting employer from retaliating against employee who makes "disclosures to a person with supervisory authority over the employee"). The Legislature's deliberate choice of "report" in enacting § 973 must be given effect by the courts. See Northfield Sch. Bd. v. Washington S. Ed. Ass'n, 2019 VT 26, ¶ 15, 210 Vt. 15, 210 A.3d 460 ("[W]e presume that the Legislature chose its words advisedly." (quotation omitted) (alteration in original)); see also 2B N. Singer & J. Singer, Sutherland Statutory Construction § 51:2 (7th ed. 2007) (observing that "[c]ourts assume that a legislature always has in mind previous statutes relating to the same subject when it enacts a new provision" and that "[g]enerally . . . where a legislature inserts a provision in only one of two statutes that deal with a closely related subject, courts construe the omission as deliberate rather than inadvertent").

¶ 60. In sum, I am convinced that § 973 protects reports of threats to state employees or persons under the state's care, even if the threat or its underlying cause is well known. By submitting reports that inadequate mental health staffing posed an appreciable and ongoing threat to the safety of SSCF staff and inmates, plaintiff engaged in protected activity. That is true notwithstanding the fact that the staffing issues were already known. Protecting these corroborative reports (to the extent to they were purely corroborative) conforms to the plain language of § 973, reflects the Legislature's intent, and furthers § 973's public policy.

25

### III. Sufficiency of Comparator

¶ 61.  Given my conclusion that plaintiff engaged in protected activity, I now turn to DOC's argument concerning the final stage of the burden-shifting framework under McDonnell Douglas—whether plaintiff proved by a preponderance of the evidence that DOC's stated reasons for terminating plaintiff were pretextual.[8]  Griffis, 2008 VT 125, ¶ 12.  DOC contends plaintiff could not establish pretext because the individual he identified as a "comparator" did not engage in conduct of comparable seriousness.  DOC argues that the trial court erred in admitting the comparator evidence.

¶ 62.  When a defendant gives a legitimate and nonretaliatory reason for an adverse employment decision, a plaintiff can point to the defendant's different treatment of a similarly situated individual as a "comparator" to show that the reason is pretextual.  See Iuorno v. DuPont Pharm. Co., 129 Fed. App'x 637, 640-41 (2d Cir. 2005) (summary order) (observing that use of comparator is one method for establishing pretext).  As McDonnell Douglas explained, evidence of disparate treatment between employees who allegedly engaged in conduct of "comparable seriousness" is "[e]specially relevant" to showing pretext.  411 U.S. at 804.  A plaintiff can therefore establish pretext by "showing that the employer subjected [them] to disparate treatment, that is, treated [them] less favorably than a similarly situated employee outside of [their] protected group."  Graham v. Long Island R.R., 230 F.3d 34, 38-39 (2d Cir. 2000).

¶ 63.  A plaintiff may use a fellow employee as a comparator only if that employee is "similarly situated to the plaintiff in all material respects."  Radwan v. Manuel, 55 F.4th 101, 132 (2d Cir. 2022) (quotation omitted).  Whether two persons are so situated "in all material respects"

---

[8]  On appeal, DOC challenges only the "protected activity" element of plaintiff's prima facie claim for lack of legally sufficient evidence.  No other prima facie element under McDonnell Douglas is at issue.  See Griffis, 2008 VT 125, ¶ 12.  There is also no argument that defendant failed to articulate a legitimate and nondiscriminatory reason for terminating plaintiff.  Therefore, the only remaining dispute concerns DOC's final claim on appeal—whether plaintiff adduced legally sufficient evidence to show that DOC's reasons for terminating plaintiff were pretextual.

is case specific and involves a two-part inquiry: "(1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer-imposed discipline was of comparable seriousness." Id. (quotation omitted) (alteration in original).

¶ 64. The following additional facts are relevant to plaintiff's application of the comparator theory. At trial, DOC proffered legitimate reasons for terminating plaintiff. Ante, ¶ 2. Primarily, DOC explained that it terminated plaintiff for intimidating a health services professional into changing her recommendation of a seriously functionally impaired inmate from "segregation is contraindicated" to "segregation is contraindicated for more than [fourteen] days." This conduct potentially placed the inmate "at further risk of harm." DOC found that plaintiff engaged in conduct that was intimidating, coercive, unprofessional, and demeaning, as well as improperly "expressing concerns or frustrations in the presence of subordinate employees." It concluded that plaintiff violated two Work Rules: Work Rule 6, which prohibits an employee from engaging in demeaning, harassing, or insulting behavior towards other employees or offenders, and Work Rule 9, which prohibits an employee from comporting themselves "in a manner that reflects discredit on the DOC." DOC reasoned that plaintiff's conduct warranted immediate termination under DOC's Human Resources Policy 9.1.

¶ 65. To counter DOC's rationale, plaintiff introduced comparator evidence related to plaintiff's successor as superintendent, Edward Adams. Much of that evidence came through the testimony of Caroline Marsh, who served as the assistant superintendent under Adams and plaintiff. Marsh recounted numerous incidents where Adams engaged in behavior that was demeaning, harassing, bullying, intimidating, homophobic, and sexist.

¶ 66. In one such incident, Marsh felt physically threatened by Adams as he screamed at her and her colleagues for having raised safety and security concerns. In another, Adams instructed Marsh and another female staff member to deal with an individual heard crying "because dealing

with emotions was women's work." Adams also physically threatened Marsh after she resisted his efforts to order new televisions in violation of an agency directive. In one episode of harassment, Adams threw objects at Marsh while raging about a caseworker's work performance. That particular area of frustration led Adams to ask Marsh if he "need[ed] to unzip his pants" in order for the caseworker to follow his instructions. In fact, Adams told Marsh that he "got hard at the idea of firing people." Marsh was also the subject of Adams's homophobic innuendos, with Adams targeting her sexuality and mocking the sexuality of an inmate.

¶ 67. After accepting another job, Marsh reported these incidents to DOC in a written report and verbally during her exit interview with DOC officials. Although Adams was walked out of SSCF the day after Marsh's exit interview, he remained employed with DOC.

¶ 68. DOC argues that, as a matter of law, plaintiff was not similarly situated to Adams because plaintiff engaged in more serious misconduct.[9] However, this Court has explained that "in comparing employment discipline decisions, precise equivalence in culpability between the employees is not required." In re Grievance of Butler, 166 Vt. 423, 431, 697 A.2d 659, 665 (1997) (quotation omitted). We have instead set a lenient standard for determining whether two individuals are legally comparable in the employment context. "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Id. (quotation omitted) (emphasis added).

¶ 69. This standard reflects the broad agreement that the "similarly situated" inquiry is fact specific and should be left to the factfinder. As such, "the question [of] whether two employees are similarly situated is a question of fact for the jury." Radwan, 55 F.4th at 132 (quoting Mandell v. Cnty. of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)); Brown v. Daikan Am.

---

[9] The parties appear to agree that both plaintiff and Adams were subject to the same workplace standards, thus satisfying the first prong of the "similarly situated" inquiry. See Radwan, 55 F.4th at 132.

Inc., 756 F.3d 219, 230-31 (2d Cir. 2014) (reversing dismissal for failure to state a claim because whether plaintiff and comparators were similarly situated was question of fact, not law). A court should not displace the jury's role as the factfinder so long as the evidence provides "an objectively identifiable basis for comparability." Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 54 (2d Cir. 2014) (quotation omitted).

¶ 70. Plaintiff met that threshold here. DOC found that plaintiff engaged in conduct that violated Work Rules 6 and 9, both of which largely concerned plaintiff's behavior towards a fellow staff member and the effects it could have on an inmate's health. However, at the center of plaintiff's termination was his abusive, coercive, and harassing conduct towards other staff. Plaintiff offered evidence that Adams likewise engaged in conduct that exhibited all of these traits. A rational juror could therefore conclude that plaintiff and Adams engaged in conduct of similar seriousness.

¶ 71. To be sure, DOC notes that plaintiff's conduct posed a possible risk to an inmate's health.[10] It points out that placing a seriously functionally impaired inmate in segregation could cause that inmate's mental health to worsen and possibly lead to self-harm. But there was also evidence that the poor morale of the staff likewise posed a safety risk to SSCF operations. Plaintiff testified about how low morale among correctional staff could create an environment leading to a higher risk of jeopardizing the health of inmates. Marsh followed up on that evidence by testifying how Adams created that intolerable environment with his abusive behavior. Regardless of how DOC labels their conduct, both Adams and plaintiff arguably risked the health of inmates based

---

[10] Indeed, DOC attempts to distinguish plaintiff from Adams by noting that plaintiff's conduct also violated Work Rule 3, which prohibits any behavior that endangers a member of the public, and a DOC directive which governs placing an inmate with a mental illness in segregation. But DOC did not find that plaintiff's conduct rose to the level of violating either of those provisions. To the extent that DOC speculates plaintiff violated those provisions, it has no bearing on DOC's stated reasons for terminating plaintiff and is therefore irrelevant for the comparator inquiry.

on the evidence. Dotson v. City of Syracuse, 763 Fed. App'x 39, 41 (2d Cir. 2019) (summary order) ("[T]he different labels given to the two infractions . . . obscure their similar underlying facts."). It is, of course, debatable if the effects of that misconduct were of equal seriousness. But that debate was for the jury.

¶ 72. DOC also contends that, unlike Adams, plaintiff induced another to commit misconduct when he directed an employee to convince the health services professional to change her assessment of the inmate's suitability for segregation. But Adams likewise tried to induce Marsh into committing misconduct. According to the evidence, Adams sought to force Marsh into purchasing televisions for a particular unit of SSCF, which Marsh believed violated a DOC directive. Regardless of how convincing that comparison is, that task must be left to the finder of fact.

¶ 73. In all, the record evidence is enough for a rational jury to conclude that plaintiff and Adams were engaged in conduct of comparable seriousness. This is not to say that plaintiff's conduct could not be distinguished from Adams's, or that plaintiff's evidence was exceptionally strong. While differences do exist between plaintiff and Adams, they "are not so significant that a reasonable juror would be precluded from deciding that these employees engaged in conduct of comparable seriousness." Berube v. Great Atl. & Pac. Tea Co., 348 Fed. App'x 684, 687 (2d Cir. 2009) (summary order). The trial court properly left this ultimate question of fact for the jury. Based on the evidence before it, the jury concluded that the two were similarly situated. That determination should remain undisturbed.

IV. Future Waste as Protected Activity and Effect of General Verdict

¶ 74. The remaining question is how to properly resolve this appeal from a general verdict. Plaintiff proffered two theories that he engaged in protected activity under § 973: his reports of potential waste and his reports of inadequate mental health staffing. The general verdict

30

here did not distinguish between the two. But given the above, plaintiff could prevail on at least the latter theory. As a result, the judgment must be affirmed.

¶ 75. This Court has addressed the impact of a general verdict when an appeal from that verdict involves multiple theories for liability. "When the party seeking appellate reversal of a judgment against it has failed to request a special verdict or interrogatories which would shed light on the jury's treatment of multiple theories, that failure is significant." Contractor's Crane Serv., Inc. v. Whey Abatement Auth., 147 Vt. 441, 446, 519 A.2d 1116, 1170 (1986). This significance reflects the appellant's obligation to "demonstrate[] both error and prejudice." Id. In civil cases involving multiple independent theories of liability, defendants who lose at trial must either "show error affecting all theories of recovery or error affecting the theory upon which the jury relied." John A. Russell Corp. v. Bohlig, 170 Vt. 12, 18, 739 A.2d 1212, 1218 (1999). When there is no special verdict or interrogatories, an appealing defendant must "establish error that undermines all theories of liability submitted to the [factfinder]. If any single theory of recovery is untainted by error, we will affirm the lower court's judgment." Contractor's Crane Serv., 148 Vt. at 446, 519 A.2d at 1171.

¶ 76. Such is the case here, and in my view, it is fatal to DOC's appeal. The jury returned a general verdict for plaintiff wherein it found that DOC terminated plaintiff's employment in relation for protected activity. That finding was followed by the jury's award of $605,000 to plaintiff. The jury also found that DOC's retaliatory conduct was not willful, intentional, or egregious. The jury provided us with no other information in the general verdict. We therefore are unable to ascertain which activity—reports of waste or reports of inadequate mental health staffing—the jury relied upon to reach a verdict in plaintiff's favor. Stated differently, we "cannot determine from the general verdict whether the jury was convinced" by the theory that plaintiff's reports of potential waste was protected activity under § 973 since "[i]t could just as well have

been convinced under the alternative theory" that § 973 protected plaintiff's reports on inadequate mental health staffing. John A. Russell Corp., 170 Vt. at 19, 739 A.2d at 1218.

¶ 77. Accordingly, there is no need to address DOC's claim that plaintiff's reports of potential waste were not protected.[11] Plaintiff could prevail in his § 973 whistleblower claim under

___

[11] While I agree with the majority that plaintiff's reports of potential waste were not protected activity, I would reach that conclusion on different grounds. The majority relies on the statute's use of the present perfect phrase "has engaged in" to conclude that § 973 encompasses only reports of waste that has already taken place, not waste that will occur. Ante, ¶¶ 15-21. True, the use of the present perfect phrase "has engaged in" would normally refer to an act that has been completed or is ongoing. See Barrett v. United States, 423 U.S. 212, 216 (1976) (observing that Congress used present perfect tense to "denot[e] an act that has been completed"); see also Dobrova v. Holder, 607 F.3d 297, 302 (2d Cir. 2010) (relying on Chicago Manual Style ¶ 5.119 (15th ed. 2003)). But the terms surrounding "waste" in § 973 are similarly limited by the "has engaged in" qualifier. See United States v. Lockhart, 749 F.3d 148, 152 (2d Cir. 2014), aff'd, 577 U.S. 347 (2016) (observing that under "series qualifier" canon of statutory construction, "a modifier at the beginning or end of a series of terms modifies all the terms" (quotation omitted)). The majority's temporal limitation therefore necessarily extends to reports of violations of law, fraud, and abuses of authority.

Respectfully, the majority's interpretation of § 973 would lead to an untenable outcome. Fraser v. Sleeper, 2007 VT 78, ¶ 12, 182 Vt. 206, 933 A.2d 246 ("We interpret statutes to avoid absurd and illogical results such as this in favor of reasonable construction when a plain reading of the statute would produce a result demonstrably at odds with any conceivable legislative purpose." (quotation omitted)). It leaves an employee unable to prevent a potential fraud, abuse of power, or violation of the law by prophylactically raising the issue before the harm materializes. I cannot accept that the Legislature wanted employees to sit on their hands instead of potentially preventing the commission of fraud, abuses of power, or violations of law. Cf. Reid v. Merit Sys. Prot. Bd., 508 F.3d 674, 678 (Fed. Cir. 2007) ("The government is far better served by having the opportunity to prevent illegal, wasteful, and abusive conduct than by notice that it may only act to reduce the adverse consequences from such conduct that has already occurred.").

Instead, I believe plaintiff's reports on waste were not protected under § 973 because, based on the facts and surrounding circumstances, they merely reflected a policy dispute. Plaintiff's reports of waste were, at their core, concerns about DOC paying more if it failed to find funds to finish a project in the near term. The Act was not designed to insulate employees engaged in policy disputes over available funds to finish a construction project within a more ideal timeframe. See Johnson v. District of Columbia, 225 A.3d 1269, 1275 (D.C. 2020) ("[T]he [District of Columbia Whistleblower Protection Act] is not meant to be a weapon in arguments over policy." (quotation omitted)). That is true even if plaintiff's preferred policy might eventually extend to the safety of SSCF. "In many routine policy disagreements, any given position might be characterized as creating a risk to public health [or] safety." Edwards v. Commonwealth, 174 N.E.3d 1153, 1165 (Mass. 2021) (quotation omitted).

the theory that his reports of insufficient mental health staffing was protected activity.  The judgment should be affirmed on that basis.  Respectfully, I dissent.

_____

Associate Justice
